**RITH ENERGY, INC. Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 92–480 L.**

United States Court of Federal Claims.

June 25, 1999.

Raymond D. Battocchi, McLean, Virginia, for plaintiff. John R. Powell and Vicki Ann Paisley, of counsel.

Susan V. Cook, with whom were Assistant Attorney General Lois J. Schiffer, Deputy Chief James E. Brookshire, Environment & Natural Resources Division, Department of Justice, Washington, D.C., for defendant. Tom Bovard, Department of Interior, of counsel.

## OPINION

WIESE, Judge.

The question presented in this case is whether the Government's rejection of plaintiff's proposed mining plan, combined with the prohibition on all mining operations that that rejection occasioned, effected a taking of plaintiff's property for which just compensation is now owing under the Fifth Amendment of the United States Constitution. The issue is before us on cross-motions for summary judgment. Based on the parties' written and oral presentations, we conclude that no compensable taking has occurred and accordingly direct the entry of judgment in the Government's favor.

## BACKGROUND

*The Surface Mining Control and Reclamation Act of 1977*

Title 30 of the United States Code, section 1201(c)(1994), sets forth Congress' finding that:

(c) many surface mining operations result in disturbances of surface areas that burden and adversely affect commerce and the public welfare by destroying or diminishing the utility of land for commercial, industrial, residential, recreational, agricultural, and forestry purposes, by causing erosion and landslides, by contributing to floods, by polluting the water, by destroying fish and wildlife habitats, by impairing natural beauty, by damaging the property of citizens, by creating hazards dangerous to life and property by degrading the quality of life in local communities, and by counteracting governmental programs and efforts to conserve soil, water, and other natural resources . . . .

In recognition of these many concerns, Congress enacted the Surface Mining Control and Reclamation Act of 1977 ("SMCRA") with the express objective, among others, of establishing "a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations." 30 U.S.C. § 1202(a). Towards this end, SMCRA charges the Office of Surface Mining Reclamation and Enforcement ("OSM") with the task of regulating the surface coal mining industry by prohibiting mining operations that endanger public health and safety or harm the environment. SMCRA provides in relevant part as follows:

When, on the basis of any Federal inspection, the Secretary [of Interior] or his authorized representative determines that any condition or practices exist, or that any permittee is in violation of any requirement of this [Act] or any permit condition required by this [Act], which condition, practice, or violation also creates an imminent danger to the health or safety of the public, or is causing, or can reasonably be expected to cause significant, imminent environmental harm to land, air, or water resources, the Secretary or his authorized representative shall immediately order a cessation of surface coal mining and reclamation operations or the portion thereof relevant to the condition, practice, or violation. . . . Where the Secretary finds that the ordered cessation of surface coal mining and reclamation operations, or any portion thereof, will not completely abate the imminent danger to health or safety of the public or the significant imminent environmental harm to land, air, or water resources, the Secretary shall, in addition to the cessation order, impose affirmative obligations on the operator requiring him to take whatever steps the Secretary deems necessary to abate the imminent danger or the significant environmental harm.

30 U.S.C. § 1271(2) (1994).

*The Regulatory Process*

On June 29, 1985, almost eight years after the passage of SMCRA, plaintiff, Rith Energy, purchased two leases to surface-mine coal on about 250 acres of land situated along the Sewanee and Richland coal seams in Tennessee. At the time it acquired these leases, plaintiff was aware that its mining operations would invade the rock strata overlying the aquifer that supplies the local community with its drinking water—those geologic formations known as the Sewanee Conglomerate, the Newton Sandstone, and the Whitewell Shale.

In August 1985, plaintiff, pursuant to SMCRA, applied for a surface-mining permit.[1] SMCRA required plaintiff to obtain soil samples to determine the level of toxicity in the soil to be mined, and to prepare a Toxic Materials Handling Plan ("handling plan") explaining how it would treat any overburden[2] that exhibited a potential to cause acid mine drainage ("AMD").[3] With

[1] In addition to its mining permit, plaintiff was also required to apply for, and obtain, a permit under the Federal Water Pollution Control Act, 33 U.S.C. §§ 1311–1387 (1994 & Supp. III 1997). That act requires the issuance of a National Pollutant Discharge Elimination System ("NPDES") permit by the cognizant state regulatory body—in this case the Tennessee Division of Water Quality Control—prior to the discharge of any effluent into a state's waters. NPDES permits require compliance with all applicable federal and state water quality standards. An NPDES permit was issued to plaintiff on January 17, 1986.

[2] Overburden refers to the soils lying above the coal deposits.

[3] AMD is defined by federal regulations as "water with a pH of less than 6.0 and in which total acidity exceeds total alkalinity, discharged from an active, inactive or abandoned surface coal

the assistance of a mining consultancy firm, plaintiff obtained and submitted three soil samples, two showing a pH level of approximately 5.2 and one showing a pH level of 3.4, thus indicating a relatively low potential for AMD. Along with these samples, plaintiff also submitted a handling plan which explained that any overburden exhibiting the potential to produce AMD would be mixed and regraded with a much larger volume of non-toxic material in order effectively to buffer the potential for AMD. The plan further indicated that all surface drainage from the disturbed areas of the mine-site would be passed through a sediment pond for treatment before discharge from the property.

Based on these several representations, on January 3, 1986, OSM issued a "Finding of No Significant Impact," meaning that plaintiff's mining operations were expected to "produce little or no adverse change in the prevailing hydrologic balance ...." OSM then issued plaintiff a five-year permit to mine the Sewanee and Richland coal seams, with plaintiff's mining operations beginning immediately thereafter.

On March 25, 1986, OSM, acting in response to complaints both from local area residents and a regional environmental protection group, decided to re-sample the overburden in plaintiff's permit area. The test results obtained from these new soil samples revealed an overburden that was approximately 250% more acidic than indicated by the pH levels recorded in the test data that had accompanied plaintiff's permit application. Further, the potential neutralization factor of the soil, *i.e.*, the soil's capacity to offset the acidic overburden, was found to be nearly zero, thus indicating a roughly 500% variance from the earlier-reported data. On the basis of these changed findings, OSM concluded that the potential for AMD posed a significantly greater danger to the environment and to the public health and safety than first thought. Accordingly, on June 27, 1986, OSM suspended plaintiff's permit to mine the Sewanee seam pending submission of a new handling plan—a plan sufficient to address the increased AMD hazards evident in the soil chemistry as well as satisfy the requirements for an acceptable reclamation of the mine-site.

In July 1986, while the re-permitting process was underway, plaintiff received approval to mine a portion of the Richland seam— an area where mining could occur without disturbing the overburden above the Sewanee seam. Rith continued to mine this section of its property until May 1987, when OSM finally ordered plaintiff to cease all mining operations.[4]

Between June 1986 and September 1988, plaintiff submitted a series of handling plans to OSM. Each resulted in the issuance of a

---

mine and reclamation operation or from an area affected by surface coal mining and reclamation operations." 30 C.F.R. § 701.5 (1998). AMD occurs when certain types of acidic soil are exposed to air and water. Once AMD begins, the chemical reaction that creates the toxic product becomes self-sustaining and can continue for years, even after all mining activity has ceased.

AMD can adversely affect the quality of surface water by, *inter alia*, lowering its pH level, reducing its natural alkalinity, increasing its total hardness, and adding undesirable amounts of iron, manganese, aluminum, sulfates, and other elements and suspended materials. AMD also adversely affects groundwater by introducing contaminants and by changing pH levels, thereby threatening local residential drinking-water supplies.

The lower pH levels associated with AMD also have been demonstrated to have a lethal and pathological effect on fish. and aquatic life. As AMD lowers the water's pH level, the water becomes more toxic, thereby interfering with the metabolic processes by which bacteria, aquatic insects, and fish utilize oxygen for respiration. The neutralization of the acidity via dilution can cause manganese sludge to precipitate out, which then physically degrades benthic habitat, smothers fish eggs, and physically damages gill tissue. These processes affect both the organisms themselves and other aquatic life, such as fish, which rely on these organisms as a source of food.

Aquatic life is also destroyed by the toxicity of the chemicals in AMD, and by the iron precipitates and other suspended materials which cloud the water and coat the sides and the bottoms of water bodies, thereby destroying a stream's aesthetic qualities and preventing the growth of aquatic life.

4. From January 1986 to the end of plaintiff's mining operation, plaintiff extracted a total of 35,665.11 tons of coal or, roughly, 9.3% of the approximately 385,000 tons of minable coal existing within the boundaries of the two leases.

Technical Deficiency Letter indicating OSM's rejection of the plan for lack of technical adequacy. Eventually, plaintiff was advised by OSM that, due to the high acidity of the Sewanee overburden, an acceptable handling plan would have to incorporate the use of impermeable pods.[5] On September 6, 1988, OSM denied plaintiff's Significant Revision No. 10—plaintiff's final attempt to obtain a permit revision. This final rejection was based on the fact that, in reviewing plaintiff's submission, OSM was unable to make a finding that the application was complete and accurate, or that reclamation could be accomplished as required by SMCRA.

*The Administrative Appeals*

Upon receiving notice of the rejection of its final revision, plaintiff filed an appeal with the Department of Interior's Office of Hearing and Appeals. A six-day hearing on the denial of Significant Revision No. 10 was conducted in January 1989. On March 28, 1989, the Office of Hearings and Appeals issued a decision sustaining OSM's denial of Revision No. 10. In his opinion, Administrative Judge Torbett noted the following:

> The undersigned finds that the overburden on the north side of Applicant's permit was undeniably of a highly acidic nature. Unless Applicant could demonstrate that the pod concept would work, there would have been a high probability that there would be acid mine drainage into the Sewanee Conglomerate aquifer. Given the importance of particle size to the issue of permeability of the pods, the undersigned finds that Respondent's concerns for damage to the hydrology from Applicant's proposed toxic material handling plan were legitimate.

*Rith Energy, Inc.*, No. NX 89–1–PR at 26 (March 1989).

The opinion concluded by saying:

The evidence proves that that overburden had a high propensity to produce acid mine drainage. The clear weight of the evidence also shows that Applicant's plan would not accomplish the necessary reclamation of the site, nor would it prevent damage to the hydrologic balance. The

undersigned therefore holds that the Respondent properly denied Significant Revision No. 10 and its subsequent revisions. *Id.* at 27.

On October 24, 1989, the Interior Board of Land appeals affirmed Judge Torbett's decision stating in part: "Based on our review of the record we find that the evidence supports Judge Torbett's decision that OSMRE properly denied Rith's application for permit revision." *Rith Energy, Inc.*, 111 IBLA 239, 244 (1989).

*Judicial Proceedings*

Plaintiff's dissatisfaction with the administrative process led to its filing of three suits against the United States in the United States District Court for the Eastern District of Tennessee. The first, filed August 31, 1988, alleged that the June 27, 1986 permit suspension was an arbitrary and capricious action that violated Rith's rights to procedural and substantive due process and to equal protection of the law. Additionally, it was claimed that the action constituted a taking of Rith's property. The second action, filed January 25, 1989, sought judicial review of OSM's September 6, 1988 decision (the decision rejecting Significant Revision No. 10), as well as damages of $5 million. The third action, filed November 22, 1989, sought judicial review of the two administrative decisions—the March 28, 1989 decision of the Office of Hearing and Appeals and the October 24, 1989 decision of the Interior Board of Land Appeals. The three suits were subsequently consolidated by the district court.

On August 6, 1990, Rith moved for and obtained the dismissal of its last-filed action. As to the remaining actions, these the district court dismissed on the ground that Rith had not exhausted its administrative remedies.

On appeal, the United States Court of Appeals for the Sixth Circuit vacated the dismissal and remanded to the district court with instructions to determine whether it would be in the interests of justice to transfer the case to the Claims Court (now the

---

5. Impermeable pods completely isolate toxic and acid-producing materials, thereby preventing

contact with water and air, and thus insuring that AMD in fact is never produced.

Court of Federal Claims) pursuant to 28 U.S.C. § 1631 (1994). On May 12, 1992, the case was transferred to this court.

Following the transfer, on August 17, 1992, plaintiff filed an amended complaint alleging a taking of its property as well as various other claims for relief that essentially repeated what had been alleged in the suits before the district court. Without objection from plaintiff, all claims except the taking claim have been dismissed.

## DISCUSSION

■ The Fifth Amendment to the United States Constitution concludes with the clause: "nor shall private property be taken for public use, without just compensation." The purpose of the clause—as the much-quoted language from *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960) explains—is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Thus, in every case alleging a taking, the essential inquiry is whether the Government has caused a loss of private property for which considerations of fairness dictate the payment of appropriate compensation.

■ Traditionally, this fairness inquiry has been conducted through a three-factor analysis. Courts have examined the character of the governmental action that gave rise to the claimed loss, the extent to which that action interfered with an owner's reasonable investment-backed expectations, and the extent of the economic harm occasioned by the Government's action. *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). When "regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922).

■ Not every taking case, however, requires application of this three-factor analysis in order to determine whether the alleged property loss at issue demands the payment of just compensation. Some cases are governed by an absolute rule. Thus, for example, where the Government has physically invaded an owner's property, a taking will be recognized no matter how minimal the intrusion nor how weighty the public interests asserted in its support. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). The recognition of a *per se* taking in this circumstance is grounded in the fact that the physical dispossession of a property owner necessarily deprives that owner of all incidents of ownership in the property so affected.

■ Conversely, regulatory action that restrains an owner from the beneficial use of his property—even a restraint barring all such use—cannot become the basis of a compensable taking where the restraint that is imposed is grounded "in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership." *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1029, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). Such restrictions are seen as inhering in the title itself. As explained in *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1179 (Fed.Cir.1994), "[p]roperty rights as a matter of law since Blackstone's day have been understood to be subject to the power of the state to abate nuisances. If the imposed restraint would have been justiced under the state's traditional nuisance law, then the property owner's bundle rights did not include the right claimed, and no taking could occur."

Restrictions on the use of property that have their source in federal law also come within this rule to the extent such restrictions do no more than mirror the results that could be reached under the state's nuisance law. *Loveladies Harbor*, 28 F.3d at 1182: "Since the federal power to regulate without risk of a taking is based on the state's nuisance law ... the federal authority, if exercised, is exercised at the risk of an absence of state authority."

■ Based on the foregoing, the question we start with is whether the denial of a mining permit by federal officials, acting under the authority of SMCRA, parallels a result that could have been achieved under

the state's nuisance law. To put it most simply, would Tennessee nuisance law sanction the issuance of an injunction restraining Rith from proceeding with a surface mining operation given an adjudicated finding that, because of an inadequate handling plan, "there would [be] a high probability [of] acid mine drainage into the Sewanee Conglomerate aquifer"? *Rith Energy*, No. NX 89–1 PR at 26.

The answer is yes. Our conclusion is based on Tennessee's Water Quality Control Act of 1977 (the Act), Tenn.Code Ann. §§ 69–3–102—69–3–131 (1995 & Supp.1998)—an act that recognizes the waters of the state, including its groundwaters, as property of the state, held in public trust, and subject to a right of "the people of Tennessee, as beneficiaries of this trust ... to unpolluted waters." Tenn.Code. Ann. § 69–3–102(a).

Consistent with the state's trust obligation to its citizens, the Act goes on to declare that its purpose is "to abate existing pollution of the waters of Tennessee, to reclaim polluted waters, to prevent the future pollution of the waters, and to plan for the future use of the waters so that the water resources of Tennessee might be used and enjoyed to the fullest extent consistent with the maintenance of unpolluted waters." Tenn.Code Ann. § 69–3–102(b).

To accomplish these purposes, the Act authorizes the promulgation of standards of quality for all waters of the state, Tenn.Code Ann. § 69–3–105, and the enforcement of these standards through a permit process that applies to a broad range of specified activities including:

The development of a natural resource or the construction, installation, or operation of any establishment or any extension or modification thereof or addition thereto, the operation of which will or is likely to cause an increase in the discharge of wastes into the waters of the state or would otherwise alter the physical, chemical, radiological, biological or bacteriological properties of any waters of the state in any manner not already lawfully authorized....

Tenn.Code Ann. § 69–3–108(b)(4).

Additionally, the Act directs that "[u]nder no circumstances shall the commissioner [of environment and conservation—the state's permit-granting official] issue a permit for an activity which would cause a condition of pollution [6] either by itself or in combination with others." Tenn.Code Ann. § 69–3–108(e).[7]

To reinforce the administrative controls exercised through the permitting process, the commissioner is authorized to "[b]ring suit in the name of the department for any violation of the provisions of this part, seeking any remedy therein provided and any other statutory or common law remedy available for the control, prevention, and abatement of pollution." Tenn.Code Ann. § 69–3–107(3). That this authority includes the right to seek injunctive relief is specifically spelled out in Section 69–3–117: "The commissioner may initiate proceedings ... against any person who is alleged to have violated or is about to violate this part [*i.e.*, "Part 1—Water Quality Control Act"], conditions of permits issued under this part, the rules and regulations of the board [*i.e.*, the Water

6. "Pollution" is defined in the Act as "such alteration of the physical, chemical, biological, bacteriological, or radiological properties of the waters of this state including, but not limited to, changes in temperature, taste, color, turbidity, or odor of the waters that will:
  (A) Result or will likely result in harm, potential harm or detriment of the public health, safety, or welfare;
  (B) Result or will likely result in harm, potential harm or detriment to the health of animals, birds, fish, or aquatic life;
  (C) Render or will likely render the waters substantially less useful for domestic, municipal, industrial, agricultural, recreational, or other reasonable uses; or

  (D) Leave or likely leave the waters in such condition as to violate any standards of water quality established by the board."
  Tenn.Code Ann. § 69–3–103(22).

7. Although the Act prohibits the issuance of a permit for an activity that would cause or contribute to a condition of pollution, the commissioner may allow a water quality standard to be exceeded for a limited period of time provided "[t]he waters to which the variance applies are not used as a current source of drinking water and such use is not reasonably anticipated for the term of the variance and a reasonable time thereafter." Tenn.Code Ann. § 69–3–108(k)(1).

Quality Control board] or orders of the board or commissioner. In such action the commissioner may seek, and the court may grant, injunctive relief and any other relief available in law or equity."

To round out the commissioner's enforcement authority, the Act declares it to be "unlawful for any person to discharge any substance into the waters of the state or to place or cause any substance to be placed in any location where such substances, either by themselves or in combination with others, cause any of the damages as defined in Section 69–3–103(22) [*i.e.*, pollution damages], unless such discharge shall be due to an unavoidable accident or unless such action has been properly authorized. Any such action is declared to be a public nuisance." Tenn.Code Ann. § 69–3–114(a).

Given the above-described elements of Tennessee's water quality control statute, we think it is virtually self-evident that OSM's denial of a mining permit to plaintiff, because of the high probability of acid mine drainage into the Sewanee Conglomerate aquifer, represented an exercise of regulatory authority indistinguishable in purpose and result from that to which plaintiff was always subject under Tennessee nuisance law.

In an effort to overcome this conclusion, plaintiff points out that, in fact, it was granted a permit by the state regulatory body and therefore, it is argued, OSM's denial of a permit stands at odds rather than in harmony with the state's result. The contention is hardly persuasive. The information plaintiff submitted to the state officials no more informed them of the high probability of harm to the Sewance aquifer than did that same data when presented to the federal officials. We can justifiably assume, however, that even as the federal officials were persuaded to reexamine the validity of the permit they initially had issued, so too would the state

officials. A high probability of pollution of an aquifer is not within the tolerances of either regulatory scheme—the Tennessee Water Quality Control Act or SMCRA.[8]

## CONCLUSION

Under Tennessee's Water Quality Control Act, a permit may not be issued for the conduct of a mining operation that would cause a condition of pollution affecting the state's waters. Plaintiff's surface mining operation has been determined to hold out a high probability of introducing acid drainage into the Sewanee Conglomerate aquifer. Accordingly, that operation would not qualify for the issuance of a permit; its conduct, therefore, would constitute an enjoinable nuisance under state law. .

Pursuant to the authority of *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), and for the reasons set forth in this opinion, we conclude that no compensable taking has occurred. Defendant's motion for summary judgment is granted and plaintiff's cross-motion for partial summary judgment is denied. The Clerk is directed to dismiss the complaint.

---

8. Mining activity physically alters groundwater quality by accelerating the addition, through otherwise normal surface drainage, of suspended solids such as silt and sediment which readily erode from the mineral particles that become exposed upon the break-up of the soil, rock strata and coal deposits. Appalachian Reg'l Comm'n, Acid Mine Drainage in Appalachia, H.R. Doc. No. 91–180, vol. 1 at 15 (1st Sess.

1969). Thus where mining activities result in the disruption of substrata containing high concentrations of acidity (*i.e.*, iron sulfide minerals), the resulting alteration of the ground water satisfies the Act's definition of pollution: "such alteration of the physical . . . properties of the waters . . . that . . . will likely result in harm, potential harm, or detriment of the public health, safety, or welfare." Tenn.Code Ann. § 69–3–103(22)(A).