**RITH ENERGY, INC., Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

**No. 99–5153.**

United States Court of Appeals, Federal Circuit.

May 2, 2001.

Raymond D. Battocchi, Gabeler, Battocchi & Griggs LLC, of McLean, Virginia, argued for plaintiff-appellant. With him on the brief were John R. Powell and Vicki A. Paisley. Of counsel on the brief was Walter H. Fleischer, of Washington, DC.

Katherine J. Barton, Attorney, Environmental and Natural Resources Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were Lois J. Schiffer, Assistant Attorney General; John A. Bryson, Attorney; and Susan V. Cook, Attorney. Of counsel on the brief was Thomas A. Bovard, Attorney, Office of the Solicitor, Department of the Interior, of Washington, DC.

Glenn Sugameli, Senior Counsel, National Wildlife Federation, of Washington, DC, for amicus curiae National Wildlife Federation.

Nancie G. Marzulla, Defenders of Property Rights, of Washington, DC, for amicus curiae National Mining Association.

Before MAYER, Chief Judge, LOURIE, and BRYSON, Circuit Judges.

BRYSON, Circuit Judge.

In 1985, Rith Energy, Inc., purchased two coal mining leases in Tennessee. It subsequently applied for, and obtained, a federal permit to conduct mining operations on the leased property. After Rith had mined for a period of time, the Office of Surface Mining Reclamation and Enforcement of the United States Department of the Interior (OSM) concluded that a portion of the property on which Rith was mining contained high levels of potentially toxic materials that could pollute the groundwater in the area through a process known as "acid mine drainage." OSM therefore suspended Rith's permit and prohibited it from mining most of the coal covered by the mining leases until Rith devised a plan to address the problem of acid mine drainage at its mining site. When Rith was unable to devise a plan that satisfied OSM, Rith's request to revise its mining permit was denied and Rith was unable to conduct any more mining at the site.

After several unsuccessful administrative and judicial challenges to OSM's actions, Rith sued the United States in the Court of Federal Claims, contending that its property had been taken without compensation, in violation of the Takings Clause of the Fifth Amendment. The Court of Federal Claims granted summary judgment for the government, and Rith appealed. Because the government's conduct at issue in this case did not result in a categorical taking of Rith's property, and because Rith did not have reasonable investment-backed expectations that it would be permitted to mine in a way that would create a high risk of acid mine drainage, we affirm.

I

The Surface Mining Control and Reclamation Act of 1977 ("SMCRA"), 30 U.S.C. §§ 1201–1328, established a "nationwide program to protect society and the environment from the adverse effects of surface coal mining operations." 30 U.S.C. § 1202(a). Pursuant to SMCRA, coal mine operators such as Rith must obtain a permit in order to conduct any mining operations. 30 U.S.C. § 1256. Any permit issued under SMCRA must comply with certain environmental performance standards. 30 U.S.C. § 1265. SMCRA also authorizes the Department of the Interior to prohibit mining operations that create an imminent danger to the health and safety of the public or can reasonably be expected to cause significant, imminent

environmental harm to land, air, or water resources. 30 U.S.C. § 1271.

The environmental performance standards set forth in SMCRA require, among other things, that the mine operator

(10) minimize the disturbances to the prevailing hydrologic balance at the mine-site and in associated offsite areas and to the quality and quantity of water in surface and ground water systems both during and after surface coal mining operations and during reclamation by—

(A) avoiding acid or other toxic mine drainage by such measures as, but not limited to—

(i) preventing or removing water from contact with toxic producing deposits;

(ii) treating drainage to reduce toxic content which adversely affects downstream water upon being released to water courses;

(iii) casing, sealing, or otherwise managing boreholes, shafts, and wells and keep[ing] acid or other toxic drainage from entering ground and surface waters[.]

30 U.S.C. § 1265(b). Acid mine drainage is an environmental problem long associated with mining activity. It occurs when certain types of acidic soil are exposed to air and water. Once acid mine drainage begins, the chemical reaction that creates the toxic product becomes self-sustaining and can continue for years, long after all mining activity has ceased. *See Rith Energy, Inc. v. United States,* 44 Fed. Cl. 108, 111 n. 3 (1999); *see also* 30 C.F.R. § 701.5 (defining acid mine drainage).

The coal leases at issue are located in the Cumberland Plateau region of Tennessee. Prior to April 1984, the State of Tennessee had administered SMCRA in that region. In the wake of failures by the State to implement, administer, maintain and enforce the state program adequately, OSM took over the administration of SMCRA in Tennessee. OSM promulgated a federal program for Tennessee in October 1984. *See* 49 Fed.Reg. 15,496 (Apr. 18, 1984); 49 Fed.Reg. 38,874 (Oct. 1, 1984).

In June 1985, long after SMCRA was enacted and shortly after the federal takeover of SMCRA enforcement in Tennessee, Rith acquired the mineral leases at issue in this case. The two leases covered 250 acres in Bledsoe County, Tennessee, and cost Rith approximately $33,500. The leases included warnings regarding the uncertainties of obtaining mining permits and removing coal. After acquiring the leases, Rith applied to OSM for a permit to surface mine coal from two coal seams within the leased property, the Sewanee and Richland seams. At the time, there was extensive evidence that acid mine drainage was endemic to the Sewanee coal seam. That coal seam is situated above the Sewanee Conglomerate aquifer, a source of drinking water for area residents.

Rith planned to mine the leased property in three stages, with the first stage to cover the 89–acre area identified in the permit application. Rith estimated that a total of 385,000 tons of coal was located within the 250–acre leasehold; of that amount, Rith stated in its permit application that it anticipated obtaining 250,000 tons of coal from the 89–acre area covered by the permit.

As required by SMCRA, Rith submitted a determination of the probable hydrologic consequences of mining and reclamation operations in the subject area, supported by soil test results. The test results showed that the sampled materials were of low acidity and that the surrounding soils had buffering capabilities, thereby greatly reducing the risk of acid mine drainage.

Based in part on those test results, OSM issued Rith a permit to mine in January 1986.

In response to several complaints, OSM visited Rith's mine site in March 1986 and obtained additional soil samples. Those samples showed the presence of a thick zone of acidic material in the shale overburden of the Sewanee coal seam. The OSM samples indicated that the potential acidity of the overburden at Rith's site was some 250 percent greater than had been represented by Rith, and that the neutralization capacity of the soil was near zero. OSM directed Rith to provide further soil samples. Based on those samples, OSM concluded that the overburden posed a threat to the hydrological balance outside the permit area. In light of the "diametrically opposite" test results and what it characterized as a greatly heightened risk of acid mine drainage, OSM suspended Rith's permit in June 1986. Rith did not appeal OSM's decision to suspend its permit.

OSM invited Rith to submit a toxic materials handling plan that would take into account the heightened risk of acid mine drainage at the Sewanee coal seam. Rith submitted a number of plans in an effort to have the suspension lifted, but none satisfied OSM that Rith had adequately addressed the concerns OSM had raised. From shortly after the issuance of the suspension order until May 1987, however, Rith was permitted to continue mining portions of the Richland coal seam where the risk of acid mine drainage was not as great. Rith ultimately extracted approximately 35,700 tons of coal from the Sewanee and Richland coal seams, which resulted in a profit of approximately $14 per ton.

In September 1988, OSM rejected Rith's final proposed toxic materials handling plan and denied a permit to resume mining in the disputed area. Rith then filed an administrative appeal pursuant to 30 U.S.C. § 1264. In the administrative appeal, Rith challenged OSM's actions on a number of grounds, including its contention that acid mine drainage was unlikely to occur at the mine site and that its toxic materials handling plan was sufficient to prevent hydrologic damage outside the permit area if acid mine drainage did occur.

After a hearing, an administrative law judge from the Interior Department's Office of Hearings and Appeals sustained OSM's rejection of Rith's plan. The administrative law judge concluded that "the overburden on the north side of [Rith's] permit was undeniably of a highly acidic nature" and that it "had a high propensity to produce acid mine drainage." Absent an adequate toxic materials handling plan, the administrative law judge found, there was "a high probability that there would be acid mine drainage into the Sewanee Conglomerate aquifer." Finally, the administrative law judge concluded that Rith's toxic materials handling plan "would not accomplish the necessary reclamation of the site, nor would it prevent damage to the hydrologic balance." Rith appealed the decision of the administrative law judge to the Interior Board of Land Appeals (IBLA), which upheld the administrative law judge's findings and affirmed his ruling.

Both before and after the conclusion of the administrative proceedings, Rith instituted several actions in the United States District Court for the Eastern District of Tennessee challenging OSM's conduct with respect to Rith's mining permit, including an action seeking review of the IBLA ruling. In August 1990, Rith moved to dismiss the action in which it sought review of the IBLA decision. The district court granted that motion and dismissed the appeal with prejudice. After most of the

claims in the other proceedings were dismissed on jurisdictional grounds, the only remaining claim from the various district court actions was Rith's claim for damages of $5 million against the United States. The district court transferred that claim to the United States Court of Federal Claims in May 1992.

In the Court of Federal Claims, Rith filed an amended complaint that included a takings claim. On cross-motions for summary judgment, the court ruled that no taking had occurred and accordingly entered judgment for the United States. The court found that "OSM's denial of a mining permit to plaintiff, because of the high probability of acid mine draining into the Sewanee Conglomerate aquifer, represented an exercise of regulatory authority indistinguishable in purpose and result from that to which plaintiff was always subject under Tennessee nuisance law." *Rith Energy*, 44 Fed. Cl. at 115. The fact that Rith was granted a surface water discharge permit by the state regulatory body was not persuasive evidence that Rith's mining activities were consistent with state law, the court explained, because

> [t]he information plaintiff submitted to the state officials no more informed them of the high probability of harm to the Sewanee aquifer than did that same data when presented to the federal officials. We can justifiably assume, however, that even as the federal officials were persuaded to reexamine the validity of the permit they initially had issued, so too would the state officials. A high probability of pollution of an aquifer is not within the tolerances of either regulatory scheme—the Tennessee Water Quality Control Act or SMCRA.

*Id.*

In an order denying a motion for reconsideration, the trial court added that the property use that was denied in this case—"the conduct of a surface mining operation that held out a 'high probability' of introducing acid mine drainage into the Sewanee Conglomerate aquifer"—is not a property use that Rith "could legitimately claim it had a right to pursue in consonance with relevant state property and nuisance principles." *Rith Energy, Inc. v. United States*, 44 Fed. Cl. 366, 367 (1999).

II

Rith asserts that by preventing it from mining on the property covered by its coal leases, the government took its property without compensation, in violation of the Fifth Amendment. The Court of Federal Claims rejected Rith's takings claim on the ground that under Tennessee nuisance law, Rith had no right to mine in a way that was likely to produce acid mine drainage, and that its property right in the coal leases therefore did not include the right to mine the Sewanee seam in the way that it wanted to. The court's analysis was based on the so-called "nuisance defense" to takings claims described by the Supreme Court in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), where the Court held that to avoid constituting a taking, a regulatory restraint that prohibits all economically beneficial use of land "must inhere in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership." *Id.* at 1029. The Court in *Lucas* explained that when a regulation "that declares 'off-limits' all economically productive or beneficial uses of land goes beyond what the relevant background principles would dictate, compensation must be paid to sustain it." *Id.* at 1030.

Rith argues that its activities would not have been contrary to Tennessee nuisance

law and that OSM's restraint on Rith's mining activities, which deprived Rith of all economic value in the coal leases, therefore constituted a compensable taking of its property interest in those leases. We need not reach the question whether Rith's mining activities would have been prohibited by Tennessee nuisance law, however, because we conclude that when Rith purchased its coal leases it did not have any reason to expect that it would be permitted to mine in a way that was likely to produce acid mine drainage.

### A

 Under the current state of takings law, it is often important to determine at the outset whether a particular claimed taking was "categorical" or not. A categorical taking has been defined as one in which "all economically viable use, i.e., all economic value, has been taken by the regulatory imposition." *Palm Beach Isles Assocs. v. United States,* 231 F.3d 1354, 1357 (Fed.Cir.), *modifying* 208 F.3d 1374 (Fed.Cir.2000). A categorical taking is distinct from a taking "that is the consequence of a regulatory imposition that prohibits or restricts only some of the uses that would otherwise be available to the property owner, but leaves the owner with substantial viable economic use." *Id.* In *Palm Beach Isles,* this court held that one significant difference between a categorical taking and a non-categorical taking is that in the former case, analyzing whether compensation is due does not require an inquiry into whether the plaintiff had reasonable investment-backed expectations that were defeated by the regulatory measure that gave rise to the takings claim.

We agree with the government that the regulatory restraint at issue in this case did not result in a categorical taking. During the period that Rith was permitted to mine coal under the permit that OSM

issued in January 1986, it extracted approximately 15,900 tons of coal from the leased property. Even after OSM suspended Rith's permit in June 1986, OSM permitted Rith to continue mining coal from one of the two coal seams on the property, and Rith extracted an additional 19,800 tons of coal from that seam. Although Rith stated in its permit application that it expected to extract a total of approximately 250,000 tons of coal from the property covered by the permit (and later stated that it expected to extract approximately 385,000 tons of coal from the entire 250 acre area), Rith acknowledges that the 35,700 tons of coal that it extracted before it terminated its mining activities produced a profit of approximately $14 per ton, or a total profit of approximately $500,000, for Rith's investors. Because Rith purchased the coal leases for a total of $33,500, it was able to recover its investment and considerably more in spite of the permitting restrictions imposed by OSM.

 Rith argues that in determining whether the government action in this case constituted a categorical taking, the loss to Rith must be measured as of September 1988, when OSM refused to accept Rith's last version of its toxic materials handling plan. After that date, Rith was unable to mine any more coal from the leased property, and Rith contends that as of that time it was deprived of all remaining economic value in the coal leases.

In measuring the regulatory burden on Rith's mining activities, it is appropriate to look at the extent to which Rith was able to exploit its leases throughout the permitting period. By focusing on its inability to mine any coal under its permit after September 1988, Rith ignores the fact that it was allowed to extract a substantial amount of coal under its mining permit prior to that date. If the permit had

provided at the outset that Rith could mine 35,700 tons of coal on the 89 acres that were covered by its permit, it would not be accurate to characterize the regulatory restraint as categorical. The analysis is not different simply because OSM imposed a condition on the permit during the course of Rith's mining activities that had the effect of preventing Rith from extracting any more than the 35,700 tons it had already mined. If, for example, OSM's restraints had been made effective after Rith had removed half the coal from the leased property, it could hardly be said that the restraint gave rise to a categorical taking because OSM's prohibition on further mining took the entire remaining value of the leases as of that time. *See Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 643–44, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) ("a claimant's parcel of property could not first be divided into what was taken and what was left for the purpose of demonstrating the taking of the former to be complete and hence compensable"); *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 478–79, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987).

Because Rith applied for a permit to mine all of the coal within the 89–acre area identified in the application, the impact of OSM's action must be measured, at minimum, by the entire coal reserve covered by the permit, not the portion that remained at the time Rith was forced to stop mining. The regulatory program began with the issuance of the permit in January 1986, extended through the period in which the permit was suspended, starting in June 1986, and ended when Rith abandoned further efforts to devise a satisfactory toxic materials handling plan in September 1988. During the first six months of that period, Rith was able to mine under the authority of the permit, and even during the period following the permit suspen-sion, Rith was allowed to continue mining coal from one of the two seams on the leased property. Viewing the impact of the regulatory program as a whole, OSM's restraints significantly limited Rith's rights to mine, but even within those limits Rith was able to mine a significant amount of coal that earned Rith a substantial profit on its investment in the leases.

■ In determining whether a taking is categorical, "the owner's opportunity to recoup its investment or better, subject to the regulation, cannot be ignored." *Florida Rock Indus., Inc. v. United States*, 791 F.2d 893, 905 (Fed.Cir.1986); *see Forest Props., Inc. v. United States*, 177 F.3d 1360, 1367 (Fed.Cir.1999) (the fact that, despite the challenged regulatory restraint, the value of the subject property increased more than three-fold in 11 years "itself undermines Forest's contention that its property was taken"). While the $500,000 in profit that Rith earned on the extracted coal was far less than it hoped to earn from the coal leases, the sum was considerably more than the $33,500 that Rith invested in the leases. Thus, the 35,700 tons, although only about 14 percent of the amount Rith hoped to extract under its permit, cannot be regarded as merely a "nominal" recovery, *see Florida Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1567 (Fed.Cir.1994), reflecting the "total wipe-out" that accompanies a categorical taking, *see Palm Beach Isles*, 208 F.3d at 1380. For that reason, it is not appropriate to characterize OSM's restraints as "a prohibition of all economically viable use" of the property in question, *see Florida Rock*, 18 F.3d at 1564–65. The restraint in this case therefore did not result in one of "the relatively rare situations where the government has deprived a landowner of all economically beneficial uses." *Lucas*, 505 U.S. at 1018, 112 S.Ct. 2886.

B

█ Under this court's decision in *Palm Beach Isles*, the consequence of concluding that there was no categorical taking in this case is that in order to establish that OSM's regulatory restraints constituted a compensable taking, Rith must show that it had a reasonable investment-backed expectation that it would not be subject to such restraints when it acquired the coal leases. Our precedents make clear that Rith could not have had such expectations. SMCRA was enacted eight years before Rith purchased the coal leases. Its provisions include environmental performance standards that directly address acid mine drainage and make clear that surface mining will not be permitted unless the permittee minimizes the "disturbances to the prevailing hydrologic balance at the mine-site and in associated offsite areas and to the quality and quantity of water in surface and ground water systems ... by avoiding acid or other toxic mine drainage...." 30 U.S.C. § 1265(b)(10). In light of that statutory provision, Rith could not reasonably have expected that it would be free from regulatory oversight with regard to the potential for acid mine drainage, and it could not reasonably have expected that it would not be required to adopt potentially expensive measures to avoid acid mine drainage if OSM determined that its mining activities could result in the release of those or other toxins. As this court explained in *M & J Coal Co. v. United States*, 47 F.3d 1148, 1154 (Fed.Cir. 1995), at the time Rith acquired its mining rights, "it knew or should have known that it could not mine in such a way as to endanger public health or safety and that any state authorization it may have received was subordinate to the national standards that were established by SMCRA and enforced by OSM." *See generally Good v. United States*, 189 F.3d 1355, 1362 (Fed.Cir.1999) (holding that the property owner had no reasonable investment-backed expectations because he "had both constructive and actual knowledge that either state or federal regulations could ultimately prevent him from building on the property"); *Creppel v. United States*, 41 F.3d 627, 632 (Fed.Cir.1994) (stating that one who buys with knowledge of regulatory restrictions on the use of property "assumes the risk of economic loss. In such a case, the owner presumably paid a discounted price for the property. Compensating him for a 'taking' would confer a windfall.").

█ Section 521(a)(2) of SMCRA, 30 U.S.C. § 1271(a)(2), provides that when the Secretary determines that any condition exists that creates "an imminent danger to the health or safety of the public or is causing, or can reasonably be expected to cause significant, imminent environmental harm to land, air, or water resources," the Secretary may order the immediate cessation of surface coal mining operations relating to that condition. Although OSM did not explicitly invoke section 521(a)(2) when it suspended Rith's permit in June 1986, that was the apparent source of its authority to issue the suspension order. Because Rith did not appeal the suspension of its permit, it was not necessary for the administrative law judge to address directly whether the standard of section 521(a)(2) was satisfied, but the administrative law judge's findings in the appeal from the denial of the revision to Rith's permit support the suspension—particularly his findings that absent an effective toxic materials handling plan, there was "a high probability that there would be acid mine drainage into the Sewanee Conglomerate aquifer" resulting in damage to the hydrologic balance. In support of his findings, the administrative law judge cited testimony from an OSM employee that Rith's mine site "contained one of the highest

levels of acid material that he had ever seen, nationwide, in nine years of looking at hundreds of permits." The Court of Federal Claims, moreover, noted that it is well known that acid mine drainage can destroy aquatic life and create serious problems for domestic and public water supplies, and that acid mine drainage can continue for years, even after mining operations have been halted. *Rith Energy*, 44 Fed. Cl. at 111 n. 3. For those reasons, the court agreed with the administrative law judge that if OSM had failed to act, there was a high probability that acid mine drainage would have occurred, severely polluting the Sewanee Conglomerate and endangering domestic and public water supplies.

 Although Rith attacks the lawfulness of OSM's rejection of its toxic materials handling plan, that challenge is not properly before us. Like the coal mine operator in *M & J Coal*, Rith had the opportunity to challenge the lawfulness of OSM's actions, including the suspension of its permit, the rejection of its toxic materials handling plan, and the ultimate denial of its permit in administrative proceedings and through judicial review in a United States district court. In fact, Rith challenged the rejection of its toxic materials handling plan administratively, and lost. Like the coal mine operator in *M & J Coal*, Rith appealed that decision to the IBLA. After losing before the IBLA, Rith sought judicial review in federal district court, but dismissed that action. In a similar setting, we held in *M & J Coal* that "[n]either the Court of Federal Claims nor this court may entertain a collateral challenge to the validity of OSM's actions," *id.* at 1154, and we see no reason to depart from that holding here.

## C

 Citing *Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358 (Fed. Cir.1998), Rith argues that it should be given an opportunity to challenge the lawfulness of OSM's suspension and permit denial in this action. *Del-Rio*, however, does not authorize such a challenge. In *Del-Rio*, we held that the plaintiff could bring a takings claim without first challenging the lawfulness of the government's action, or establishing the scope of its property interest, in an administrative proceeding. That is so because a takings claim lies, as long as the government's action was authorized, even if the government's action was subject to legal challenge on some other ground. We explained that an uncompensated taking and an unlawful government action constitute "two separate wrongs [that] give rise to two separate causes of action," and that a property owner is free either to sue in district court for asserted improprieties committed in the course of the challenged action or to sue for an uncompensated taking in the Court of Federal Claims. *Id.* at 1364. To proceed on the second cause of action does not require that the plaintiff first litigate, and lose, on the first. Nor is the plaintiff required to use the administrative review proceeding to establish the scope of the property right that it contends was taken. *See id.* .

 To the extent that Rith suggests that *Del-Rio* entitles it to argue in the Court of Federal Claims that OSM's permit denial was unlawful under SMCRA, or to relitigate in the takings action its unsuccessful statutory challenge to the permit denial, it reads too much into *Del-Rio*. The question whether OSM violated SMCRA by its ruling on a permit application in a particular case was assigned by Congress to the administrative process within the Department of the Interior, subject to judicial review in a district court. *Del-Rio* does not give the Court of Federal Claims authority to adjudicate that issue *de novo*. Thus, if the plaintiff

claims that its property was taken *regardless of* whether the agency acted consistently with its statutory and regulatory mandate, *Del–Rio* stands for the proposition that the takings claim can be litigated in the Court of Federal Claims without the need first to litigate the issue of lawfulness in administrative proceedings before the agency. On the other hand, to the extent that the plaintiff claims it is entitled to prevail *because* the agency acted in violation of statute or regulation, *Del–Rio* does not give the plaintiff a right to litigate that issue in a takings action rather than in the congressionally mandated administrative review proceeding.

██ In this case, having forgone its challenge to OSM's administrative actions, Rith is not free to renew its challenge to those actions under the cover of a takings claim in the Court of Federal Claims. Rith is thus required to litigate its takings claim on the assumption that the administrative action was both authorized and lawful. On the facts of this case, the consequence of assuming the lawfulness of OSM's actions, i.e., that OSM was correct in concluding that Rith's mining activities constituted an unacceptable threat of acid mine drainage and the consequent pollution of groundwater in the area surrounding the mine operations, is to limit the issue before us to whether prohibiting Rith from mining under those circumstances constitutes a taking. And on that issue, as we have explained, the absence of a reasonable investment-backed expectation on Rith's part that it would be permitted to mine while producing acid mine discharge in violation of SMCRA defeats its takings claim. We therefore uphold the judgment of the Court of Federal Claims.

*AFFIRMED.*