**APPOLO FUELS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 00–1L.

United States Court of Federal Claims.

Dec. 18, 2002.

James R. Golden, Middlesboro, KY, for plaintiff.

Dorothy R. Burakreis, Washington, DC, with whom was Assistant Attorney General Thomas L. Sansonetti, for defendant. Daniel W. Kilduff, Department of the Interior, of counsel.

### OPINION

MILLER, Judge.

This takings case comes before the court after argument on defendant's motion for summary judgment. The Government prevented plaintiff from surface mining coal based on a citizens' petition that obtained federal protection for a reserve on which plaintiff planned to mine. Plaintiff, thwarted from pursuing its endeavor, sued, claiming a permanent, as well as a temporary, regulatory taking. Defendant also filed a motion *in limine* to prevent the landowner from challenging a determination that its mining activities contravened federal environmental law.

### FACTS

The facts recited herein are undisputed, unless otherwise noted.

1. *The Surface Mining Control and Reclamation Act of 1977*

In 1977 Congress passed the Surface Mining Control and Reclamation Act, 30 U.S.C. §§ 1201–1328 (2002) ("SMCRA" or the "Act"), in an effort to regulate the "expansion of coal mining to meet the Nation's energy needs" by establishing "appropriate standards to minimize damage to the environment and to productivity of the soil and to protect the health and safety of the public." 30 U.S.C. § 1201(d). The Act created the Office of Surface Mining Reclamation and Enforcement ("OSM") within the Department of the Interior and charged OSM with the implementation of SMCRA. *See* 30 U.S.C. § 1211(a), (c).

To comply with SMCRA, an organization must obtain a permit from the appropriate state regulatory authority before engaging in surface coal mining operations.[1] *See* 30 U.S.C. § 1256. An applicant, in order to receive a permit, must show that it can conduct its surface mining in accordance with SMCRA's criteria, which include several environmental requirements. SMCRA also allows, in accordance with section 1272(c), any "person having an interest which is or may be adversely affected to ... petition the regulatory authority to have an area designated as unsuitable for surface coal mining operations ...." Within ten months of the receipt of such a petition, OSM "shall hold a public hearing in the locality of the affected area ...." § 1272(c). OSM must release "a written decision regarding the petition, and the reasons therefore [sic]" within 60 days of the public hearing. *Id.*

Section 1272(a)(2) of the Act requires the state regulatory authority to "designate an area as unsuitable for all or certain types of surface coal mining operations if [it] determines that reclamation pursuant to the requirements of [the] Act is not technologically and economically feasible." Moreover, the Act prohibits surface mining, unless approved by the appropriate authorities, that will "adversely affect any publicly owned park or places included in the National Register of Historic Sites," or "within three hundred feet from any occupied dwelling, unless waived by the owner thereof, [or] within three hundred feet of any public building, school, church, community, or institutional building, public park, or within one hundred feet of a cemetery." §§ 1272(e)(3), (5). If an area previously has been designated as unsuitable for surface coal mining, an interested party may petition to have the designation terminated. *See* § 1272(c).

### 2. *Plaintiff's business operations*

Appolo Fuels, Inc. ("plaintiff"), is a Kentucky corporation engaged in the business of mining and selling coal. It was incorporated in 1972 by various members of the Asher family and was formed primarily to produce and sell coal from the area around Middlesboro, Kentucky. During the 1980's and into the mid–1990's, plaintiff obtained approximately one half of its coal supply from underground mines. Although plaintiff employs independent contractors for its surface, underground, and auger mining operations, it conducts preparation and loading operations at its own facilities in Paramount, Kentucky. Once the coal is processed at the Paramount facility, it is sold through Diversified Energy, Inc., a corporation that is related to plaintiff.

### 3. *The section 1272 petition*

In August 1989 plaintiff contracted with White Oak Coal Co., Inc. ("White Oak"), to purchase certain assets, including two coal leases, a tipple lease, and all existing mining permits attached to these leases, for $2,500,000.00. One of the leases plaintiff purchased had been granted by the J.M. Huber Corporation ("Huber"); this lease was dated April 1, 1986, and it covered approximately 2,600 acres in Bell County, Kentucky, and Claiborne County, Tennessee. On August 10, 1989, plaintiff and Huber negotiated a new lease ("Lease 5A"), which gave plaintiff strip and deep mining rights in certain coal seams,[2] including seams within the Little Yellow Creek watershed ("the Creek watershed"). The Creek watershed is located near plaintiff's Paramount facilities and spans across the Tennessee–Kentucky border. The Little Yellow Creek drains into Fern Lake, which serves as a water supply for the population of Middlesboro.

Plaintiff began mining under Lease 5A in 1989, and, on February 8, 1994, applied for a permit from OSM to mine 214 acres within the Tennessee portion of the Creek watershed.[3] On February 14, 1994, the City of Middlesboro and the National Parks Conser-

---

1. In October 1984 OSM took over the administration of SMCRA in Tennessee, as the state program charged with implementing SMCRA had failed to maintain the program adequately. *See Rith Energy, Inc. v. United States,* 247 F.3d 1355, 1359 (Fed.Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 2660, 153 L.Ed.2d 835 (2002).

2. Lease 5A was amended on October 23, 1990, to include auger mining rights.

3. OSM assigned number 2943 to plaintiff's permit application.

vation Association filed a petition (the "section 1272 petition") with OSM seeking designation of approximately 50% of the Creek watershed, under 30 U.S.C. § 1272(c), as unsuitable for surface coal mining operations. The petitioners alleged that surface mining within the petition area would detrimentally affect the availability of water supplies; the local land use plans and programs, including the Cumberland Gap National Historical Park; and the scientific and aesthetic value of the water and lands encompassing the Creek watershed. On March 15, 1994, the section 1272 petition was deemed complete, and OSM began its evaluation process. In order to comply with the requirements of SMCRA and the National Environmental Policy Act of 1969, 42 U.S.C. § 4332(C) (2002) ("NEPA"), OSM proceeded to prepare a combined petition evaluation document and environmental impact statement (the "PED/EIS").

On March 30, 1994, OSM notified plaintiff that its permit application was administratively complete.[4] However, OSM explained that, while it could engage in a technical review of the application, final processing of the application could not be completed until a decision was made on the section 1272 petition. Plaintiff indicated, on April 6, 1994, that OSM should begin its technical review of the permit application. On November 3, 1994, plaintiff received a technical deficiency letter from OSM, which requested additional information from plaintiff necessary to continue processing its application. Plaintiff did not respond to the deficiency letter, thereby halting OSM's technical review of its application.[5]

In the January 26, 1996 Federal Register, OSM announced the availability of the draft PED/EIS and requested public comments. A public hearing was held on the PED/EIS on March 12, 1996, and OSM accepted comments until July 1, 1996. The final PED/EIS was issued in August 1996. On September 13, 1996, the Director of OSM issued his final decision on the section 1272 petition. The Director indicated that he considered the following factors in reaching his decision: 1) the draft and final PED/EIS, 2) the petitioners' allegations, 3) oral testimony from the public hearing, 4) written submissions received during the comment period, and 5) personal meetings with individuals and organizations directly impacted by the disposition of the section 1272 petition.

In the final decision on the section 1272 petition, issued on September 13, 1996, the Director ultimately decided to designate "the entire petition area as unsuitable for all surface coal mining operations but [to] allow underground mining from outside the petition area." The Statement of Reasons, also dated September 13, 1996, supporting the decision, offered several bases for the Director's decision, including: 1) the potential impact of mining on the survival of the black-side dace, an endangered species of fish present in the Creek watershed; 2) the damage that mining would cause to "important aesthetic values and natural systems" that conflict with the "goals of the master plan for the Cumberland Gap Historical Park;" and 3) the long-term effect that mining would have on Middlesboro's water supply and quality. The Director emphasized that "the most important consideration [in granting the section 1272 petition] was the impact of surface coal mining operations in the petition area on [the] productivity of the Fern Lake water supply."

### 4. Plaintiff's other coal mining interests

On September 1, 1989, plaintiff obtained an additional lease from Huber ("Lease 7A") that granted deep mining rights both within and outside the section 1272 petition area. On December 21, 1992, plaintiff acquired, for

---

4. OSM reviews applications for mining permits in three stages: First, the agency determines if an application is administratively complete; second, the application undergoes a technical review to ensure that it satisfies all legal requirements; and, third, the application is closed out, and any final matters (such as securing bonds) are addressed. See Wyatt v. United States, 271 F.3d 1090, 1094 (Fed.Cir.2001).

5. Plaintiff claims that it did not respond to the November 3, 1994 letter because the information requested by OSM was beyond the scope of SMCRA. "OSM advised [plaintiff] by this letter that it expected [plaintiff] ... to complete the [PED/]EIS." Pl.'s Br. filed Sept. 5, 2002, at 23.

$750,000.00, approximately 600 acres surrounding Fern Lake in fee simple, 367 of which fell within the section 1272 petition area. Although the property contained coal reserves, plaintiff apparently intended to use the property "as a buffer zone, so that no housing or anything else could be developed there." Pl.'s Br. filed Sept. 5, 2002, at 46.

Plaintiff executed another lease for strip and auger mining rights from Huber ("Lease 14A") on February 1, 1995. Originally, Lease 14A did not include any lands within the section 1272 petition area, and consideration for the lease consisted of annual advance royalties and production royalties. However, Lease 14A was amended on or around April 20, 1995, to include approximately 229 acres within the petition area. This amendment indicated that the acreage granted under the amendment lay "within the watershed of the Little Yellow Creek and Fern Lake and that said watershed is under a [section 1272] Petition filed with the Office of Surface Mining to declare the watershed unsuitable for mining." Lease 14A was further amended on June 1, 1996, to include mining rights within an additional 2,013 acres covered by the section 1272 petition. This amendment contained the same language regarding the petition that appeared in the April 20, 1995 amendment.[6]

Subsequent to the execution of Lease 14A, plaintiff negotiated a series of additional leases from Huber, each conveying the right to mine various coal seams both within and outside the petition area. Consideration for

these leases consisted of the same royalty arrangements negotiated for Lease 14A. Lease 15A, granting strip and auger mining rights, was executed on February 1, 1996. Leases 16A and 17A, acquired on June 1, 1996, gave plaintiff strip, auger, and deep mining rights. Plaintiff acquired Lease 18A on September 1, 1997.[7] Lease 18A originally granted plaintiff strip and auger mining rights, but was amended to include deep mining rights. Finally, plaintiff acquired deep mining rights through Lease 19A on August 1, 2001.[8]

### 5. Plaintiff's district court challenge to the section 1272 petition

On November 12, 1996, plaintiff and Huber sued the Secretary of the Department of the Interior, under 30 U.S.C. § 1276,[9] in the U.S. District Court for the Eastern District of Tennessee. The suit alleged that the granting of the section 1272 petition was arbitrary, capricious, and inconsistent with the law. Plaintiff specifically noted that OSM had exceeded the 12–month period,[10] provided in 30 U.S.C. § 1272(c), for rendering a decision on a section 1272 petition. Plaintiff claimed that exceeding the statutory time limitation violated due process and that OSM proceedings on the section 1272 petition constituted an unwarranted exercise of the Government's police powers.

On July 16, 1998, plaintiff moved to dismiss the district court action, electing instead to pursue a takings claim in the Court of Feder-

---

6. Although plaintiff acknowledges that both amendments to Lease 14A contained the same disclaimer, plaintiff counters that it had formed the expectation, years before the execution of the amendments, that it would be allowed to mine within the Creek watershed. *See* Pl.'s Br. filed Sept. 5, 2002, at 43–44.

7. One of defendant's experts indicates that Lease 18A was executed on September 9, 1997. *See* Expert Report of Stagg Resource Consultants, Inc., Nov. 20, 2001, at 35. As shown *infra* section I(2)(1), this discrepancy is immaterial to the court's analysis, so the court will utilize the September 1, 1997 date for the purposes of assessing plaintiff's claims.

8. Huber sold its surface and mining interests in the southeastern United States to BLC Properties, LLC ("BLC"), on July 5, 2001. All of the

leases obtained by plaintiff from Huber, including the royalty interests attached thereto, are now held by BLC.

9. 30 U.S.C. § 1276(a)(1) provides that any action "constituting rulemaking by the Secretary [of the Interior] shall be subject to judicial review only by the United States District Court for the District in which the surface coal mining operation is located. Any action subject to judicial review under this subsection shall be affirmed unless the court concludes that such action is arbitrary, capricious, or otherwise inconsistent with law."

10. Plaintiff arrived at the 12–month figure by totaling the two statutory deadlines in section 1272(c): 1) the requirement that OSM hold a public hearing within ten months of receiving the petition, and 2) the mandate that OSM issue a written opinion within 60 days of the hearing.

al Claims. The district court granted plaintiff's motion, and plaintiff filed its takings suit on January 3, 2000. Plaintiff alleges: 1) a permanent regulatory taking of its coal mining interests as a result of the section 1272 petition and 2) a temporary taking caused by OSM's delay in processing and granting the section 1272 petition. As to the permanent taking, plaintiff has alleged both a categorical taking and, alternatively, a "severe diminution in the value of [p]laintiff's property interests." Compl. filed Jan. 3, 2000, ¶ 20.

## DISCUSSION

I. *Defendant's motion for summary judgment*

1. *Summary judgment standard for takings cases*

While a court should avoid "precipitous grants of summary judgment" in takings cases owing to the "fact-intensive" nature of such claims, *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 887 (Fed.Cir.1983), the fact that this is a "takings case does not affect the availability of summary judgment when appropriate to the circumstances." *Avenal v. United States*, 100 F.3d 933, 936 (Fed.Cir.1996). Summary judgment is proper when no genuine issues of material fact are in dispute and the moving party is entitled to judgment as a matter of law. *See* RCFC 56(c).

2. *Regulatory taking*

Plaintiff asserts that the granting of the section 1272 petition effected a regulatory taking of certain of its property interests in the Creek watershed. It claims that the 1272 petition constitutes both a categorical regulatory taking and a partial regulatory taking described by plaintiff as a "severe diminution in the value of [p]laintiff's property interests." Compl. ¶ 20.

The Supreme Court first identified the possibility of a compensable regulatory taking in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922). Justice Holmes, as paraphrased by Justice Scalia, recognized that "if the protection against physical appropriations of private property was to be meaningfully enforced, the government's power to redefine the range of interests included in the ownership of property was necessarily constrained by constitutional limits." *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1014, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (citing *Mahon,* 260 U.S. at 414–15, 43 S.Ct. 158). While the pre-*Mahon* Court had limited its takings jurisprudence to instances of physical occupation or dispossession of private property for public uses, Justice Holmes opined that, if left constitutionally unchecked, the Government would be free, under the police power, to restrict private property uses without paying compensation. Therefore, the Court has "repeatedly and consistently endorsed Holmes' observation that 'if a regulation goes too far it will be recognized as a taking.'" *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 122 S.Ct. 1465, 1480, 152 L.Ed.2d 517 (2002) (quoting *Mahon,* 260 U.S. at 415, 43 S.Ct. 158).

After *Mahon* the Court refused to subscribe to a rigid formula for determining when a regulation goes "too far," choosing instead to engage in "essentially ad hoc, factual inquiries," *Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), designed to allow " 'careful examination and weighing of all the relevant circumstances.'" *Tahoe–Sierra,* 122 S.Ct. at 1481 n. 23 (quoting *Palazzolo v. Rhode Island,* 533 U.S. 606, 636, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) (O'Connor, J., concurring)). Nonetheless, the Court's takings jurisprudence eventually recognized two types of compensable regulatory takings: 1) categorical and 2) partial.

In the former line of cases, the Court's *Lucas* decision announced that if regulatory action destroyed all economically beneficial use of a certain parcel of property, the trial court did not need to engage in the multipronged analysis that characterizes a partial regulatory takings claim. *See* 505 U.S. at 1027, 112 S.Ct. 2886. The *Lucas* court concluded that a state environmental statute, passed after plaintiff purchased two beachfront lots, may have effected a categorical taking by preventing the residential develop-

ment of the lots and remanded the case to the South Carolina Supreme Court for final determination. In subsequent regulatory takings cases, the Court has clarified that *Lucas's* holding "was limited to 'the extraordinary circumstance when no productive or economically beneficial use of land is permitted.'" *Tahoe–Sierra,* 122 S.Ct. at 1483 (quoting *Lucas,* 505 U.S. at 1017, 112 S.Ct. 2886). The Federal Circuit has echoed this formulation, concluding that a categorical taking is effected when "all economically viable use, *i.e.,* all economic value, has been taken by the regulatory imposition." *Palm Beach Isles Assocs. v. United States,* 231 F.3d 1354, 1357 (Fed.Cir.), *modifying* 208 F.3d 1374 (Fed.Cir.2000).

If a regulation does not render the subject property essentially valueless, a landowner still may merit compensation if it has suffered a partial regulatory taking. A partial regulatory taking "is the consequence of a regulatory imposition that prohibits or restricts only some of the uses that would otherwise be available to the property owner ...." *Palm Beach Isles,* 231 F.3d at 1357. Although continuing to reject a set formula for determining when application of a government regulation produces a partial regulatory taking, the Court has recently reaffirmed its adherence to certain key factors first espoused in *Penn Central. See Palazzolo,* 533 U.S. at 633, 121 S.Ct. 2448 (O'Connor, Jr., concurring) ("Our polestar remains the principles set forth in *Penn Central* itself and our other cases that govern partial regulatory takings."). The *Penn Central* Court indicated that 1) the extent to which the regulation interfered with the claimant's investment-backed expectations, 2) the character of the government action, and 3) the economic impact of the regulation on the claimant[11] have "particular significance" when determining if a regulation has engendered a partial regulatory taking. 438 U.S. at 124, 98 S.Ct. 2646.

*1) Relevant parcel*

■ In order to evaluate plaintiff's takings claims, the court must, as a threshold matter, determine the specific parcel that plaintiff alleges has been taken, an inquiry that aptly has been characterized as the "difficult, persistent question of what is the proper denominator in the takings fraction." *Palazzolo,* 533 U.S. at 631, 121 S.Ct. 2448. Because the test for a regulatory taking requires a comparison of "the value that has been taken from the property with the value that remains in the property, one of the critical questions is determining how to define the unit of property whose value is to furnish the denominator of the fraction." *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 497, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) (internal quotation marks omitted).

The Supreme Court consistently has refused to prescribe a rigid formula for determining the appropriate parcel in regulatory takings cases, instead instructing courts to focus on "'the parcel as a whole.'" *Tahoe–Sierra,* 122 S.Ct. at 1481 (2002) (quoting *Penn Central,* 438 U.S. at 130–31, 98 S.Ct. 2646). While the Court never has issued a firm definition of what constitutes the appropriate parcel as a whole, *see Lucas,* 505 U.S. at 1016 n. 7, 112 S.Ct. 2886, it has counseled against labeling the property subject to the regulation as the appropriate parcel, noting that "[t]o the extent that any portion of property is taken, that portion is always taken in its entirety; the relevant question, however, is whether the property taken is all, or only a portion of, the parcel in question." *Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for So. Cal.,* 508 U.S. 602, 644, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993); *see also Tabb Lakes, Ltd. v. United States,* 10 F.3d 796, 802 (Fed. Cir.1993). Therefore, it is important not to "divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated," *Penn Central,* 438 U.S. at 130, 98

---

11. Although the Court has refused to establish a bright line figure to denote when the economic impact on the claimant becomes severe enough to warrant a compensable taking, a "mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Con-*

*crete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for So. Cal.,* 508 U.S. 602, 645, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993). In the case at bar, plaintiff claims that its property suffered a "severe" diminution in value. Compl. ¶ 20.

S.Ct. 2646, because "where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking." *Andrus v. Allard,* 444 U.S. 51, 65–66, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979).

Defendant argues that the appropriate "parcel as a whole" should include "all of [p]laintiff's coal interests in the petition area and surrounding areas controlled by lease or fee ownership as of the date of the alleged taking on September 13, 1996." [12] Def.'s Br. filed May 20, 2002, at 34. This parcel would include all of the mining rights granted under Leases 5A, 7A, 14A, 15A, 16A, 17A, 18A, and 19A, as well as "a number of other leases and some fee or surface owned properties." *Id.*[13] Defendant justifies this expansive parcel by claiming that all of the included "properties were ... acquired for use in [p]laintiff's coal mining operations," *id.,*[14] and cites in support the Federal Circuit's rulings in *Tabb Lakes; Forest Props., Inc. v. United States,* 177 F.3d 1360 (Fed.Cir.1999), *cert. denied,* 528 U.S. 951, 120 S.Ct. 373, 145 L.Ed.2d 291 (1999); and *Walcek v. United States,* 303 F.3d 1349 (Fed.Cir.2002).

Plaintiff counters that "the appropriate parcel for analysis here consists of the surface mineable coal reserves held by [plaintiff] within the [Creek] watershed." Pl.'s Br. filed Sept. 5, 2002, at 22.[15] While plaintiff concedes that, when determining the relevant parcel, the Supreme Court has prohibited the severance of a parcel into distinct interests, it argues that severance is not an issue in this case because plaintiff's "property right consists of coal leases which convey to [plaintiff]

but a single strand in the bundle of rights, [*i.e.,*] the right to extract a particular mineral, coal." *Id.* at 23. Plaintiff supports this view by invoking three Federal Circuit cases: *Florida Rock Indus., Inc. v. United States,* 791 F.2d 893 (Fed.Cir.1986); *Whitney Benefits, Inc. v. United States,* 18 Cl.Ct. 394, 399 (1989), *aff'd,* 926 F.2d 1169 (Fed.Cir.1991); and *Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171 (Fed.Cir.1994).

Defendant's principal case, *Tabb Lakes,* involved plaintiff's attempts to develop an 167–acre parcel of land into a residential subdivision. Plaintiff divided the property into five sections and constructed and sold houses on sections 1 and 2 over a two-year period. Because sections 3, 4, and 5 allegedly contained wetlands, the U.S. Army Corps of Engineers (the "Corps") informed plaintiff that it was required to obtain a permit to comply with the Clean Water Act (the "CWA"). Plaintiff challenged the Corps' assertion of jurisdiction in district court and prevailed in that action. Plaintiff then filed an action in the Court of Federal Claims alleging a temporary taking of its property.

On appeal the Federal Circuit noted that "the quantum of land to be considered is not each *individual* lot containing wetlands or even the combined area of wetlands." 10 F.3d at 802. However, the court ultimately did not determine whether the appropriate parcel was the entire 167 acres, or only sections 3, 4, and 5 of the development. It concluded that "this dispute need not be resolved" because "the permit system brings the facts of this case within the ambit of the

---

**12.** September 13, 1996, is the date on which the Director of OSM issued his decision on the section 1272 petition.

**13.** These additional leases and fee properties include mining rights within Kentucky and were granted or acquired between 1971 and 1997. *See* Decl. of Alan K. Stagg, May 13, 2002, Attach. 1.

**14.** Plaintiff has withdrawn its takings claims as to any coal reserves located within the state of Kentucky, so those reserves are not considered in the court's decision. *See* Pl.'s Br. filed Sept. 5, 2002, at 49–50.

**15.** Plaintiff requested that its expert, Weir International Mining Consultants ("Weir"), study the coal reserves allegedly sterilized by virtue of the

section 1272 petition. Weir included in its study the reserves within the Creek watershed granted by Leases 5A, 14A, 15A, 16A, and 18A, because it believed that the reserves within the watershed constitute a "logical mining unit." Pl.'s Br. filed Sept. 5, 2002, at 19–20. However, plaintiff instructed Weir to refrain from formulating estimates as to the value of these reserves both before and after the section 1272 petition, as it claims that "only the strip reserves within the petition area constitute the appropriate 'denominator.'" *Id.* at 20. Thus, despite the conclusions of its expert, it appears that plaintiff's proposed denominator excludes any coal reserves outside the petition area.

holdings that preliminary regulatory activity does not effect a taking in the constitutional sense." *Id.*

Defendant also puts forth *Forest Properties* as support for designating all of plaintiff's coal holdings, both within and without the Creek watershed, as the appropriate denominator in this case. In *Forest Properties* Big Bear Properties, Inc. ("Big Bear"), planned to develop for residential use a parcel of land consisting of 53 acres of lake-front property and roughly 9.4 acres of lake-bottom land contiguous to the lake-front acres. The 9.4 acres were wetlands, so Big Bear applied to the Corps for a permit to dredge and fill approximately nine acres of the wetlands. While the permit was pending, Big Bear sold a portion of the 62–acre parcel to plaintiff, and assigned the remainder without demanding additional compensation. When the Corps refused to issue a permit to develop even a portion of the total acreage, plaintiff sued for a regulatory taking in the Court of Federal Claims. After finding that the property as a whole remained profitable despite the permit denial, the trial court concluded that no compensable taking had occurred.

The Federal Circuit agreed that the "relevant parcel for takings analysis is the entire 62 acre project." 177 F.3d at 1365. Noting that precedent required the court take a flexible, fact-based approach to the parcel delineation, the court stated that this approach "requires courts to focus on the economic expectations of the claimant with regard to the property." *Id.* Because plaintiff acquired the 62 acres with the expectation of developing them as a single project, the trial court was correct in rejecting plaintiff's contention that the 9.4 acres of lake-bottom property should be the relevant parcel. "In holding that the entire 62 acre project was the relevant parcel . . . the Court of Federal Claims properly looked to the economic reality of the arrangements, which transcended . . . legalistic bright lines . . . ." *Id.* at 1366.

Finally, in a recent decision, the Federal Circuit reaffirmed its adherence to the "parcel as a whole" rule, upholding the trial court's determination that the relevant parcel was the entire tract of land owned by plaintiffs. *Walcek,* 303 F.3d at 1356. Plaintiffs in *Walcek* owned 14.5 acres of property on a Delaware beach, 13.2 of which were subject to the CWA. After the Corps denied plaintiffs a permit to develop their property for residential use, they filed a takings claim. While that action was pending, the Corps issued plaintiffs a permit allowing development on 2.2 of the 13.2 acres of wetlands, but requiring that plaintiffs create or restore 4.4 acres of additional wetlands.

The *Walcek* plaintiffs advocated at trial that the relevant parcel should be the 13.2 acres of wetlands subject to federal regulation. After the trial court rejected plaintiffs' categorical and partial regulatory takings claims, plaintiffs appealed to the Federal Circuit. There, plaintiffs argued that the relevant parcel should be the 11 acres of wetlands that the Corps protected from development and that the Supreme Court's decision in *Palazzolo,* which did not include an analysis under the *Penn Central* factors, somehow evinced a departure from the parcel-as-a-whole approach in takings cases. Rejecting both of plaintiff's arguments, the Federal Circuit upheld the trial court's determination that the entire 14.5–acre parcel served as the appropriate denominator. Citing the *Tabb Lakes* decision with approval, the Federal Circuit noted that *Tahoe–Sierra* "recently reaffirmed that in regulatory takings analysis, the relevant parcel is the parcel as a whole." 303 F.3d at 1356.

The controlling case law instructs the trial court to look beyond the regulated portion of the property in determining the appropriate parcel as a whole. In each of the three cases relied on by plaintiff, the court designated only the portion of land subject to the regulatory activity as the relevant parcel. What distinguishes these cases, however, is that their factual genesis is wholly dissimilar to the case at bar.

Plaintiff in *Florida Rock* applied for a mining permit from the Corps in order to extract limestone from a 98–acre area. The Corps denied the permit, and plaintiff filed a takings suit. Although the 98–acre tract was part of a 1,560–acre parcel owned by plaintiff, the Federal Circuit upheld the designa-

tion of the 98 acres subject to the permit as the relevant parcel.

The Federal Circuit predicated its choice of denominator on the fact that plaintiff was precluded from mining on any portion of the 1,560 acres because, at that location, it was "and, for the immediate future, remain[ed] illegal to mine without a permit in the only fashion [plaintiff] consider[ed] feasible." 791 F.2d at 904. In this case plaintiff retains several leasehold and fee interests outside the section 1272 petition area and is fully entitled to mine these areas. The section 1272 designation prohibits only surface mining in the Creek watershed and expressly allows underground mining from outside the petition area. Moreover, the various Huber leases grant surface, deep, and auger mining rights in areas both within and outside the Creek watershed. Therefore, unlike the scenario in *Florida Rock*, plaintiff is able to mine in areas not affected by the Government's regulatory activity.

Plaintiffs in *Whitney Benefits*, having purchased a lease for coal mining rights to certain lands, applied for a permit from Wyoming state authorities to perform surface strip mining. Plaintiffs withdrew the request for procedural reasons, and, before they could refile, SMCRA became law. While negotiating with federal authorities to take advantage of SMCRA's exchange provision,[16] plaintiffs filed a takings claim. Plaintiffs had intended to mine the entirety of their coal estate using surface methods, and the trial court concluded that any permit application to mine in that fashion would run afoul of SMCRA's prohibitions. As for other mining methods, the trial court noted that "little evidence [was presented] to refute plaintiffs' contention that underground mining of Whitney coal is economically and technologically unfeasible." 18 Cl.Ct. at 405. Thus, the trial court concluded that SMCRA had effected a taking of plaintiffs' property.

The Federal Circuit affirmed, stating that the "only property here involved is the right to surface mine a particular deposit of coal." 926 F.2d at 1172. Thus, *Whitney Benefits*

stands in stark contrast to the situation faced by plaintiff in the present case. Plaintiff previously has taken (and can now and in the future take) advantage of its surface, auger, and deep mining rights outside the petition area and is prohibited only from engaging in surface mining within the petition area. Plaintiff cannot analogize its situation to that of landowners that faced effective abrogation of all of their coal mining interests by SMCRA's passage.

The third case cited by plaintiff also does not provide support for its choice of denominator. Plaintiff in *Loveladies* owned a 250-acre parcel of land, including 11.5 acres of wetlands and one acre of filled land. Plaintiff had developed 199 acres before the passage of the CWA and applied for a permit from the appropriate New Jersey authorities and the Corps to fill 50 acres in order to cultivate the undeveloped 51-acre area for residential use. Plaintiff eventually obtained permission from state authorities to develop only 12.5 acres of the unimproved land, leaving the remaining 38.5 acres "for all practical purposes . . . promised to New Jersey." 28 F.3d at 1181. However, plaintiff was denied a federal permit for any portion of the undeveloped 51 acres. After unsuccessfully challenging the federal permit denial in district court, plaintiff filed a takings claim. The trial court excluded all acreage developed before the taking occurred, as well as acreage claimed by the state.

In reviewing the "denominator problem," the Federal Circuit noted that, as part of the "factual nuances" informing the parcel determination, the court should "include consideration of the timing of transfers in light of the developing regulatory environment." 28 F.3d at 1181. Because the Government established its regulatory framework after 199 acres of plaintiff's land had been developed, the trial court was correct in excluding that acreage from the denominator. Moreover, after the State of New Jersey forced plaintiff to leave 38.5 acres of the remaining 51 acres undeveloped, "whatever substantial value that land had now belongs to the state and

---

**16.** Section 1260(b) of SMCRA allows claimants who made substantial legal and financial commitments to coal property before the passage of

SMCRA to exchange that property for federal coal holdings. *See Whitney Benefits,* 18 Cl.Ct. at 397–98.

not to [plaintiff]." *Id.* Thus, the relevant denominator properly excluded that acreage. Consequently, the relevant parcel consisted of the 12.5 acres covered by the New Jersey permit.

The relevant parcel in *Loveladies* coincided with the area covered by the permit only because the remainder of plaintiff's property was either developed before the imposition of the federal regulatory scheme or was required by the state to remain undeveloped wetlands. In the case at bar, plaintiff acquired Lease 5A in 1986 and obtained a series of leases from Huber during the next ten-plus years. SMCRA, the regulation which occasioned the alleged taking, was passed by Congress in 1977. Therefore, the court is not presented with a situation in which plaintiff's expectations as to the development of the property were formed before the imposition of a regulatory framework.[17] Moreover, neither the state of Tennessee nor the federal government has barred plaintiff from mining in the portions of the leases outside the petition area.

A fair distillation of the applicable case law requires the court to adhere to the factual inquiry warranted by the parcel-as-a-whole rule and to avoid any formalistic distinctions with respect to the property itself. *Forest Properties,* 177 F.3d at 1365–66; *see also District Intown Props. Ltd. P'ship v. District of Columbia,* 198 F.3d 874, 880 (D.C.Cir. 1999) (noting that "a court must also consider [when determining the correct parcel] how both the property owner and the government treat (and have treated) the property"). Courts have been willing to designate the area subject to government regulation as the appropriate denominator if the area contains the whole of a claimant's viable economic interests. *Florida Rock,* 791 F.2d at 904; *Loveladies,* 28 F.3d at 1181; *Whitney Benefits,* 926 F.2d at 1172. In evaluating a regulatory takings claim, the court properly can consider the timing of property acquisition vis-à-vis the imposition of the regulatory scheme. *Loveladies,* 28 F.3d at 1181.

When viewed against these parameters, plaintiff's proposed denominator—the coal reserves only within the petition area— proves unsupportable. Plaintiff's formulation ignores its leasehold interests outside the petition area and outside the Creek watershed. Although it is proper to consider plaintiff's economic expectations with regard to the property, *see Forest Properties,* 177 F.3d at 1365, plaintiff has presented no evidence that it considered the petition area a distinct entity apart from its other leasehold interests. Indeed, plaintiff manifests that the company pursued the Huber leases in order "to ultimately exploit all of the surface mine reserves in the Fern Lake basin." Pl.'s Br. filed Sept. 5, 2002, at 8. Tellingly, plaintiff's own expert concluded that the coal reserves within the Creek watershed constituted a logical mining unit. *See supra* note 15. Plaintiff consequently cannot claim that the petition area was viewed as an economic entity separate from its coal holdings in the vicinity.

Plaintiff's argument to label the reserves in the petition area as the relevant parcel ignores Supreme Court precedent on the issue. The Court repeatedly has counseled against labeling the regulated property as the appropriate parcel because such a delineation, in practical application, would necessitate a finding of a compensable regulatory taking. *See Tahoe–Sierra,* 122 S.Ct. at 1483 ("[D]efining the property interest taken in terms of the very regulation being challenged is circular. With property so divided, ... the moratorium and the normal permit process alike would constitute categorical takings."); *Concrete Pipe,* 508 U.S. at 644, 113 S.Ct. 2264 ( "To the extent that any portion of property is taken, that portion is always taken in its entirety."). The Court has also made clear that plaintiff may not sever a portion of its property interest in order to claim complete abrogation of its rights in the severed portion. *See Penn Central,* 438 U.S. at 130, 98 S.Ct. 2646. Although plaintiff denies that it is engaged in this practice, it

---

**17.** The Supreme Court recently affirmed that a takings analysis must consider "the role [of] the temporal relationship between regulatory enactment and title acquisition ...." *Palazzolo,* 533 U.S. at 632, 121 S.Ct. 2448 (O'Connor, J., concurring) (cited with approval in *Tahoe–Sierra,* 122 S.Ct. at 1486).

has put forth no evidence to support this disclaimer.

Turning to defendant's proposed parcel, the court equally is unconvinced by its choice of denominator. Defendant exhorts that all of the mining rights granted under Leases 5A, 7A, 14A, 15A, 16A, 17A, 18A, and 19A, as well as those contained in plaintiff's other, unspecified land holdings, should constitute the relevant denominator. *See* Def.'s Br. filed May 20, 2002, at 34. Plaintiff purchased Leases 5A and 7A in 1989 and acquired approximately 600 acres in fee surrounding Fern Lake on December 21, 1992. Plaintiff executed Lease 14A on February 1, 1995, and obtained two amendments, dated April 20, 1995, and June 1, 1996, to that lease which granted mining rights to land covered by the section 1272 petition. Lease 15A was executed on February 1, 1996, and plaintiff acquired Leases 16A and 17A on June 1, 1996. Finally, plaintiff executed Lease 18A on September 1, 1997, and Lease 19A on August 1, 2001.

The section 1272 petition was filed on February 14, 1994, and the Director of OSM granted the petition on September 13, 1996. Both parties acknowledge that any alleged taking commenced on September 13, 1996. This date comports with precedent dictating that a takings claim begins when a regulatory body makes a final decision to prevent the property owner from exploiting his or her property in a certain way. *See Walcek*, 303 F.3d at 1353 (regulatory takings claim began on date of Corps' final decision on permit application). Thus, logic would dictate that, if the alleged taking commenced on the date the petition was granted, mining interests acquired after that date should be excluded from the takings denominator. *See* Def.'s Br. filed May 20, 2002, at 34 (arguing that

appropriate denominator includes "all of Plaintiff's coal interests . . . as of the date of the alleged taking on September 13, 1996"). As a consequence Leases 18A and 19A should be excluded from the relevant parcel, because plaintiff obtained them after the alleged taking commenced.[18]

The same approach necessitates the inclusion of Lease 5A in the relevant parcel. Lease 5A was executed in 1989 and contains coal interests both within and outside the Creek watershed. Plaintiff's plan to mine under Lease 5A prompted plaintiff to apply for the permit that precipitated the section 1272 petition. Moreover, it is apparent that plaintiff viewed the acquisition of Lease 5A as the initial phase in its plan to mine within the Creek watershed. Because plaintiff explained that it "typically planned its operation five years in advance," Pl.'s Br. filed Sept. 5, 2002, at 6, plaintiff knew by the late 1980's that it would need a replacement for the mine reserve held in Red Springs, west of Middlesboro, as that reserve was projected to be exhausted by the mid–1990's. When plaintiff's president, in the late 1980's, became aware that coal reserves were available within the Creek watershed, he began acquiring leases in that area. Therefore, because the court must consider plaintiff's overall business plan for the land at issue, the inclusion of Lease 5A in the denominator is proper.

Plaintiff acquired approximately 600 acres in fee in 1992 with the intention that the property be used "as a buffer zone, so that no housing or anything else could be developed there." Def.'s Br. filed May 20, 2002, at 13. Although plaintiff apparently did not intend to mine the property, plaintiff's expert, Weir International Mining Consultants

---

18. Defendant advocates including Lease 18A, which it admits that, owing to the date it was executed, "would normally not be included" in the takings denominator. Def.'s Br. filed May 20, 2002, at 34 n. 23. Defendant's rationale is that plaintiff "was the most logical lessee." *Id.* It also argues that Lease 19A should constitute a portion of the denominator because "it is part of old Lease 17A, which was too expensive [for plaintiff] to maintain." *Id.* Defendant cites the deposition of Salvador A. Gaudiano, Jr., plaintiff's treasurer, in support of this argument. However, Mr. Gaudiano, when asked about the

similarities between the 17A and 19A leases, stated that "the 17A [lease] incorporated about 35 million tons of coal. [Lease 19A] doesn't. [19A] is just one portion of [17A]." Dep. of Salvador A. Gaudiano, Jr., Oct. 30, 2001, at 64. Defendant has cited no case law to support the inclusion of leases executed after the date of the alleged taking, and Mr. Gaudiano's statements do not establish that Lease 19A is Lease 17A by another name. In these circumstances defendant's speculative evidence does not warrant inclusion of Leases 18A and 19A in the denominator.

("Weir"), examined coal reserves in plaintiff's fee properties when assessing the section 1272 petition's impact on plaintiff's coal holdings. *See* "Geologic and Reserve Study: Appolo Fuels, Inc. Property, Fern Lake Petition Area," Vol. I, Aug. 2001, Table 2A (the "Weir Study"). Even if the property was acquired only to protect plaintiff's mining operations from unwanted development, plaintiff treated the property as part of its overall mining plan for the area around the Creek watershed. *See Forest Properties,* 177 F.3d at 1366 (holding that when determining relevant parcel, trial court "properly looked to the economic reality of the arrangement"). Thus, this acreage shall be included in the parcel as a whole.

Although plaintiff obtained Lease 7A in 1989, well before it embarked on the permitting process, both plaintiff's and defendant's experts agree that the lease provided plaintiff with no reserves with any economic value. Lease 7A granted deep mining rights in two coal beds located in Kentucky and Tennessee. However, these coal reserves were not included in Weir's assessment of the property allegedly taken, as Weir concluded that "none of the deep mining reserves within the watershed were economic as of September 13, 1996," the day the Director of OSM granted the section 1272 petition. Pl.'s Response to Def.'s Proposed Finding of Fact No. 48, filed Sept. 5, 2002. Stagg Resource Consultants, Inc., ("Stagg"), tasked by defendant with assessing the reserve potential of the relevant coal bearing properties, arrived at the same conclusion. When assessing plaintiff's underground reserve potential, Stagg noted that underground mines had been established on the beds included in Lease 7A, but that neither bed "proved to be economic." Expert Report of Stagg, Nov. 20, 2001, at 43. Accordingly, Stagg formed the opinion that no reserves with any value existed on Lease 7A.

Therefore, Lease 7A should not constitute a portion of the parcel as a whole, because the section 1272 petition did not impact plaintiff's ability to mine under that lease. By the date the section 1272 petition was granted, no economically viable coal reserves existed on Lease 7A. Thus, plaintiff cannot claim that the section 1272 petition "took" any of the value of that lease, as the only rights the lease contained—deep mining rights—had provided no economic benefit to plaintiff. The inclusion of an already valueless lease would not help or hinder either party, as the 7A coal reserves would not bear on the extent to which the section 1272 petition impacted the economic value of the relevant parcel. Accordingly, the court excludes Lease 7A from the parcel as a whole.

The remainder of plaintiff's leaseholds, acquired before 1996, presents closer questions. Leases 14A, 15A, 16A, and 17A were all obtained between the filing and the grant of the section 1272 petition. When executed on February 1, 1995, Lease 14A originally did not contain any land covered by the section 1272 petition; however, in two subsequent amendments, plaintiff did obtain the right to mine in areas affected by the disposition of the petition. These amendments were obtained more than a year after the filing of the section 1272 petition and contained explicit language indicating that the land at issue was subject to the petition. Plaintiff explains that it "acquired the 14A [l]ease on the expectation of a favorable decision [on the petition] rendered in a timely manner, yet the deadline for the decision was repeatedly moved back." Pl.'s Br. filed Sept. 5, 2002, at 13. Nevertheless, plaintiff was fully aware of the pending petition, and the possibility that it would be granted, when it obtained the amendments to Lease 14A. It was aware of this same possibility when it executed Leases 15A, 16A, and 17A in the months previous to the OSM Director's decision.[19]

It also is apparent that plaintiff viewed Leases 14A, 15A, 16A and 17A as part of its plan to mine within the Creek watershed. Because plaintiff acquired these leases before the OSM Director's decision, and because plaintiff held the opinion that the section 1272 petition would be denied, plaintiff viewed these leases as part of its overall plan

---

19. Plaintiff contacted OSM in late 1994 to inquire as to the status of the section 1272 petition and sent repeated requests regarding the petition throughout 1995 and 1996. *See* Pl.'s Br. filed Sept. 5, 2002, at 13–15.

to mine in the Creek watershed. Thus, as it is proper for the court to consider plaintiff's overall business plan for the land at issue, the denominator must include Leases 14A, 15A, 16A, and 17A.

The court finds, considering both the timing of the Director's decision on the section 1272 petition and the economic realities of plaintiff's coal acquisition plan, the relevant parcel includes the coal reserves granted by Leases 5A, 14A, 15A, 16A, and 17A, as well as the reserves contained in the 600 fee acres acquired by plaintiff in 1992.

### 2) Categorical taking

Plaintiff alleges that the granting of the section 1272 petition effected a categorical regulatory taking of its property. In *Lucas* the Supreme Court determined that a state regulatory scheme passed after plaintiff purchased two beachfront lots could effect a categorical taking of plaintiff's property. *See* 505 U.S. at 1031, 112 S.Ct. 2886. The regulatory scheme at issue prohibited plaintiff from constructing homes on the lots, and the trial court found that the prohibition had rendered the lots valueless. Because the regulation destroyed all economically beneficial use the land, plaintiff argued, and the Supreme Court agreed, that plaintiff could demand compensation without attacking the validity of the regulation itself. In order for the state to avoid compensating plaintiff for a taking, it would be required to show that the use prohibited by the regulation "inhere[d] in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place on land ownership." *Id.* at 1029, 112 S.Ct. 2886. Because the trial court had not considered this "nuisance defense" to compensation, the Supreme Court remanded the case.

■ Subsequent to its decision in *Lucas,* the Supreme Court and the Federal Circuit delineated that categorical takings effected by regulations occur only when the regula-

tion at issue leaves the property economically idle or prohibits all viable economically beneficial use of the land. *See Tahoe–Sierra,* 122 S.Ct. at 1483; *Palazzolo,* 533 U.S. at 617, 121 S.Ct. 2448; *Palm Beach Isles,* 231 F.3d at 1357. The Federal Circuit also affirmed that a categorical takings analysis, unlike a partial regulatory takings analysis, does not necessitate an inquiry into whether the plaintiff had reasonable investment-backed expectations that were defeated by the regulatory measure. *Palm Beach Isles,* 231 F.3d at 1364. Thus, the court need not consider plaintiff's expectations regarding its mining properties when determining whether a categorical taking has occurred.

■ Defendant, seizing upon the nuisance defense articulated in *Lucas,* argues that plaintiff's claim should be denied "because, in granting the [section 1272 petition], OSM did no more than prohibit a use that is tantamount to a nuisance under Tennessee law." Def.'s Br. filed May 20, 2002, at 36. Defendant argues that Tennessee common law treats water pollution as a nuisance and that water pollution constitutes a nuisance *per se* under the Tennessee Water Quality Control Act of 1977 (the "TWQCA").

Plaintiff rejoins that *Lucas* requires defendant to proffer more than the section 1272 decision in making its nuisance claim. Defendant must "put forward proof which would be the equivalent of that necessary to sustain an injunction in state court on the issue." Pl.'s Br. filed Sept. 5, 2002, at 31. Further, plaintiff queries whether the TWQCA constitutes "one of the 'background principles' of state law which inform the nuisance exception," *id.* at 33–34, and whether defendant has shown that plaintiff's mining plan would violate the TWQCA's provisions. Finally, plaintiff contends that it satisfied the TWQCA's requirements when it successfully negotiated "an arduous technical review process" with the Tennessee Department of Environment and Conservation ("TDEC"). *Id.* at 35.[20]

---

20. According to plaintiff, it applied for an Aquatic Resource Alteration Permit ("ARAP") from TDEC in February, 1993. TDEC is charged with administering the TWQCA and subjected plaintiff's application to a "lengthy technical review process." Pl.'s Br. filed Sept. 5, 2002, at 9.

Although it is not clear if plaintiff obtained an ARAP from TDEC, plaintiff proffers that the agency "stood ready to issue [plaintiff] its ARAP water quality permit" as of January 21, 1994. *Id.* at 10. Defendant disputes that plaintiff's argument regarding the ARAP permit process is

In focusing on the nuisance issue, the parties ignore the import of the Federal Circuit's decision in *Rith III*. *See Rith Energy, Inc. v. United States*, 44 Fed.Cl. 108 (*"Rith I"*), *recons. denied*, 44 Fed.Cl. 366 (1999) (*"Rith II"*), *aff'd on other grounds*, 247 F.3d 1355 (Fed.Cir.) (*"Rith III"*), *reh'g denied*, 270 F.3d 1347 (Fed.Cir.2001) (*"Rith IV"*). That case involved the revocation of a coal mining permit previously granted to plaintiff by OSM in Tennessee. Having acquired leases after the enactment of SMCRA, which granted mining rights to 250 acres in Tennessee, plaintiff applied for, and initially received, a mining permit from OSM for an 89–acre portion of its holdings. However, OSM subsequently determined that plaintiff's mining activities posed "a threat to the hydrological balance outside the permit area." *Rith III* at 1360. Specifically, OSM concluded that the potential for acid mine drainage posed a greater danger to the environment than first perceived. Under the authority vested in it by SMCRA, OSM suspended plaintiff's permit, but allowed plaintiff to mine on a small portion of the regulated property, until plaintiff could devise a plan to minimize the mining's effect on the surrounding ecosystem. When plaintiff was unable to formulate a plan that satisfied OSM's parameters, it refused to issue a permit to resume mining in the disputed area.

After exhausting challenges to the permit denial through administrative and judicial channels, plaintiff filed suit, claiming that the permit denial constituted a compensable taking. Pointing to the TWQCA, the trial court found that OSM's permit denial, based on the potential for acid mine drainage, represented an "exercise of regulatory authority indistinguishable in purpose and result from that to which plaintiff was always subject under Tennessee nuisance law." *Rith I* at 115. On this basis the *Lucas* nuisance defense was deemed satisfied, and the court concluded that no compensable taking had occurred.

The Federal Circuit, although affirming the finding of no compensable taking, concluded that it did "need not reach the question whether [plaintiff's] mining activities would have been prohibited by Tennessee

nuisance law." *Rith III* at 1362. The court noted that, when "measuring the regulatory burden on [plaintiff's] mining activities, it is appropriate to look at the extent to which [plaintiff] was able to exploit its leases throughout the permitting period." *Id.* Plaintiff could not focus only on the period following the permit revocation and then claim that it suffered a categorical regulatory taking, because such parsing would violate the Supreme Court's parcel-as-a-whole analysis. *Id.* at 1363. Finally, the court noted that, when assessing whether a taking is categorical, "the owner's opportunity to recoup its investment or better, subject to the regulation, cannot be ignored." *Id.* (citing *Florida Rock*, 791 F.2d at 905); *accord Forest Properties*, 177 F.3d at 1367 (finding that increase in value of property after imposition of regulatory scheme undermined plaintiff's takings claim).

The court then concluded that plaintiff did not suffer a categorical taking, as it was able to extract coal before the suspension of the permit and continued to mine, with OSM's permission, on a portion of the property subject to regulation. Although plaintiff had expected to extract 250,000 tons of coal from the permit area and 380,000 tons from the entirety of its leased holdings, it still was able to extract 35,700 tons of coal before ceasing its mining operations. Moreover, the 35,700 tons were valued at $500,000.00; because plaintiff had paid only $33,500.00 for the leases, it was able to recoup its investment in spite of the permit denial. Thus, even though plaintiff was able to harvest only 9% of its mining estimates, this percentage did not constitute the " 'total wipe-out' " necessary for a categorical taking. *Rith III* at 1363 (quoting *Palm Beach Isles*, 208 F.3d at 1380).

*Rith III* requires an analysis of plaintiff's mining activities in the parcel as a whole in order to determine whether a categorical taking has occurred. As an initial matter, it is beyond dispute that the OSM Director's decision on the section 1272 petition prohibited only one type of mining (surface) on one portion of the parcel as a whole (the petition area). The section 1272 decision allowed un-

supported by the record. *See* Def.'s Br. filed Oct. 16, 2002, at 20 n. 17.

derground mining from outside the petition area to continue. It allowed mining of all types to continue on the portions of Leases 5A, 14A, 15A, 16A, and 17A that fell outside the petition area. Plaintiff's own figures showcase that it has not suffered a categorical taking. Although plaintiff readily admits that Weir has not valued separately coal reserves inside versus outside the petition area, it claims that Weir estimated that 2,313,000 tons of mineable strip coal lie within the Creek watershed on the 5A Lease. *See* Pl.'s Br. filed Sept. 5, 2002, at 49. Plaintiff's former chief engineer, Eugene S. Boston, estimates that roughly 500,000 tons of strip coal lie outside the watershed. *See* Decl. of Eugene S. Boston, Aug. 27, 2002, ¶ 2.

Thus, plaintiff calculates that 78% of the tonnage on Lease 5A has been lost owing to the section 1272 petition. Even assuming, *arguendo,* that the section 1272 petition rendered plaintiff unable to mine in the watershed,[21] the *Rith IV* court held that an 91% reduction in the amount of mineable coal did not constitute a categorical taking. *See Rith IV* at 1349. Using the same methodology, plaintiff also claims that the section 1272 decision rendered 92% of the strip reserves on Lease 14A unmineable. *See* Pl.'s Br. filed Sept. 5, 2002, at 49. Although this percentage exceeds the amount of coal allegedly lost on Lease 5A, the court cannot view Lease 14A in a vacuum; instead, it must determine the effect of the decision on the parcel as a whole.[22]

The leases constituting the parcel as a whole granted a variety of mining rights in the petition area, in other areas of the Creek watershed, and outside the Creek watershed. While the section 1272 petition prevented plaintiff from performing surface mining in a certain part of the Creek watershed, plaintiff was not prohibited from exploiting its leases and its fee property in areas outside the petition area. Imposition of the section 1272 petition did not render the subject property economically idle. The court finds that plaintiff has not established a categorical taking.

### 3) *Partial regulatory taking*

■ Because plaintiff has not suffered a categorical taking, the court next turns to plaintiff's claim that the section 1272 petition effected a partial regulatory taking of its property. In *Tahoe–Sierra* the Court reaffirmed that the three factors identified in *Penn Central* and discussed above remain the touchstone in a partial regulatory takings analysis. *See* 122 S.Ct. at 1481, n. 23. Although the court considers each of these factors in a partial regulatory takings analysis, the court will, in accordance with *Rith III* and *Rith IV,* first discuss plaintiff's investment-backed expectations.

### i. *Investment-backed expectations*

In her concurring opinion in *Palazzolo,* Justice O'Connor elaborated on the investment-backed expectations prong of the partial regulatory takings analysis. *See* 533 U.S. at 633–34, 121 S.Ct. 2448. She concluded that a court must consider "the temporal relationship" between the regulation's enactment and title acquisition, since "the regulatory regime in place at the time the claimant acquires the property at issue helps to shape the reasonableness" of plaintiff's investment-backed expectations. *Id.* at 634, 121 S.Ct. 2448. Moreover, "the nature and extent of permitted development under the regulatory regime *vis-à-vis* the development sought by the claimant may also shape legitimate expectations . . . ." *Id.* at 634, 121 S.Ct. 2448. While investment-backed expectations "are not talismanic under *Penn Central,*" they inform the analysis of "whether the application of a particular regulation to particular

---

**21.** Plaintiff makes repeated references to coal reserves "sterilized" by the section 1272 petition, and Weir estimates that the amount of saleable coal allegedly sterilized on September 13, 1996, totaled 11,734,164 tons. *See* Decl. of Weir, Aug. 27, 2002, ¶ 4.

**22.** Even if the court were to determine that the entire parcel suffered a 92% loss in coal reserves, and a corresponding 92% loss in value, this num-

ber would not qualify as a "total wipe-out" that signifies a categorical taking. *Palm Beach Isles,* 208 F.3d at 1380. The Supreme Court has acknowledged that "the categorical rule would not apply if the diminution in value were 95% instead of 100%." *Tahoe–Sierra,* 122 S.Ct. at 1483; *see also Palazzolo,* 533 U.S. at 631, 121 S.Ct. 2448 (finding that 94% reduction in property value did not constitute categorical taking).

property 'goes too far.' " *Id.* at 634, 121 S.Ct. 2448 (quoting *Mahon*, 260 U.S. at 415, 43 S.Ct. 158).

Defendant finds plaintiff deficient with respect to the investment-backed expectations prong of the *Penn Central* analysis. Relying on *Rith III*, defendant posits that because plaintiff was well aware of SMCRA when it began obtaining leases in the Creek watershed, and because plaintiff knew of the section 1272 petition in negotiating all leases beginning with Lease 14A, plaintiff held no legitimate expectation that it could mine in the area unfettered by regulation. Plaintiff counters that existing OSM permits had been obtained on what became the 5A lease when it was purchased and that it "makes its living by complying with the provisions of SMCRA and has done so successfully for over twenty (20) years." Pl.'s Br. filed Sept. 5, 2002, at 44. Plaintiff reminds defendant that a section 1272 petition is an "extraordinary process" which was "certainly not predictable ... [because] no such petition had previously been filed concerning mining operations in the [Creek] watershed during the 1970's and 1980's." *Id.* at 44–45. Finally, it dismisses *Rith* as inapposite to the case at hand, making the bold claim that plaintiff in *Rith* had been afforded an opportunity to pursue administrative and judicial remedies for its permit denial. Plaintiff argues that the judicial review afforded the granting of section 1272 permits does not equate to the scrutiny given permit denials.

The Federal Circuit made clear in *Rith III* that "the consequence of concluding that there was no categorical taking in this case is that in order to establish that OSM's regulatory restraints constituted a compensable taking, [plaintiff] must show that it had a reasonable investment-backed expectation that it would not be subject to such restraints when it acquired the coal leases." *Rith III* at 1364. In that case plaintiff had no such expectation. Because SMCRA was enacted eight years before plaintiff acquired the coal leases at issue, and because the Act contained provisions that directly addressed acid mine drainage, plaintiff could not reasonably think that it "would be free from regulatory oversight with regard to the potential for

acid mine drainage." *Id.* The court also noted a series of holdings that stand for the proposition that a property owner that takes property subject to an existing regulation reasonably cannot expect that it will be allowed untrammeled discretion in developing that property. *See Good v. United States*, 189 F.3d 1355, 1362 (Fed.Cir.1999) (concluding that property owner's "constructive and actual knowledge that either state or federal regulations could ultimately prevent him from building on the property" precluded any reasonable investment-backed expectations); *M & J Coal Co. v. United States*, 47 F.3d 1148, 1154 (Fed.Cir.1995) (noting that property owner cannot mine in manner to endanger public safety and health and that any state authorization received to mine "was subordinate to the national standards that were established by SMCRA and enforced by OSM").

This court must reject plaintiff's contention that *Rith* is inapposite to the case at hand. Plaintiff cannot argue that the judicial review afforded section 1272 petitions is somehow inferior to that offered to plaintiff in *Rith*, especially in light of plaintiff's refusal to pursue its remedy in district court. The facts of *Rith* are quite similar those presented by plaintiff. Plaintiff commenced its effort to obtain coal mining rights in the Creek watershed with the acquisition of Lease 5A in 1989. Thus, this lease was acquired more than ten years after the enactment of SMCRA. The two amendments to Lease 14A expressly stated that a section 1272 petition was pending. Plaintiff's argument that section 1272 petitions are "extraordinary" remedies is unavailing, given that plaintiff has not claimed that it was unaware of the possibility of a section 1272 petition; moreover, such an argument would be disingenuous in light of plaintiff's self-proclaimed status as a 20–year veteran of negotiating the SMCRA permitting process. Finally, although plaintiff is correct that one Tennessee-based, OSM-issued permit was extant on the land acquired from White Oak, the existence of this permit certainly does not substantiate plaintiff's belief that it would be allowed to mine its leased holdings in any manner it desired.

Plaintiff has thus not removed its situation from *Rith's* ambit. Moreover, it cannot deny that the temporal relationship between the enactment of SMCRA and the time it purchased the parcel at issue gave it notice that it was subject to regulation. "The investment-based expectation criterion 'limits recovery to owners who can demonstrate that they bought their property in reliance on the non-existence of the challenged regulation. One who buys with knowledge of a restraint assumes the risk of economic loss.'" *Forest Properties*, 177 F.3d at 1367 (quoting *Creppel v. United States*, 41 F.3d 627, 632 (Fed.Cir. 1994)). Plaintiff, with its acknowledged long history in negotiating SMCRA permits, cannot claim now that it had a reasonable expectation that its land would remain unfettered by regulatory imposition.

The court finds that plaintiff lacked reasonable investment-backed expectations regarding the development of the relevant parcel.

### ii. *Character of the government action*

Although the *Rith III* court rested its conclusion that no compensable taking had occurred solely on the investment-backed expectations prong of *Penn Central*, it briefly addressed the nature of the government action in *Rith IV*, so this court will do the same. The Federal Circuit has recognized that the *Lucas* decision fundamentally changed the court's analysis of the character of the government action. While courts previously had been called upon "to make *ad hoc* balancing decisions, balancing private property rights against state regulatory policy, ..." *Lucas* shifted the focus to a framework where "state property law, incorporating common law nuisance doctrine, controls." *Loveladies*, 28 F.3d at 1179. Thus, if the Government shows that the activity it was regulating constituted a nuisance in the state's common law, it can avoid paying compensation because the right to engage in the activity was excluded from the owner's title. *See Lucas*, 505 U.S. at 1029, 112 S.Ct. 2886.

The Federal Circuit addressed the nuisance issue in *M & J Coal* and *Rith IV*. Both of these cases involved the SMCRA permit process, as delegated to OSM. In *M & J Coal*, OSM issued a cessation order after plaintiff engaged in mining activities that put the public at risk of ground subsidence, collapsing structures, and cracks in utility lines. The order stated that plaintiff created "an imminent danger to the health and safety of the public." 47 F.3d at 1151. The Federal Circuit, in reviewing plaintiff's takings claim, stated that plaintiff "could not have acquired under its deed of title the right to cause damage or a substantial risk of damage to the public health and safety." *Id.* at 1154. Thus, it was "incontestable that OSM's actions were legitimate exercises to prevent harm to the public health and safety." *Id.*

The *Rith IV* court echoed language from *M & J Coal* when it suggested that the "exercise of the police power directed at protecting the safety, health, and welfare of the communities ..." surrounding the regulated area "is the type of government action that has typically been regarded as not requiring compensation for the burdens it imposes on private parties who are affected by the regulations." *Rith IV* at 1352. Because the revocation of plaintiff's permit was directed at preventing environmental harm, the state was acting within its police power and not engaging in an activity for which it was required to compensate plaintiff.

Defendant therefore can avoid compensation under this prong of the *Penn Central* analysis by showing that it was abating a common law nuisance by exercising its police power in granting the section 1272 petition. Defendant asserts that plaintiff's mining activities in the petition area would constitute a nuisance *per se* under the TWQCA and recites a litany of Tennessee cases which define water pollution as an enjoinable nuisance. Plaintiff rejoins that the findings made by the Director of OSM on the section 1272 petition are not conclusive in this action, as they are not the result of a judicial proceeding. Moreover, the support offered for the Director's decision in the PED/EIS, according to plaintiff, would not prove a violation of the TWQCA or warrant the issuance of an injunction.

The Director of OSM based his decision on several factors, including prevention of harm to 1) the blackside dace, 2) the development

of the Cumberland Gap Historical Park, and 3) the quality of the city of Middlesboro's water supply. When analyzing the section 1272 petitioners' allegations, OSM specifically found that surface coal mining operations would "result in the diminution of water quality and increase water treatment costs .... " PED/EIS, Aug. 1996, p. IV–23.[23] Thus, if water pollution is an enjoinable nuisance under Tennessee law, then, under the rationale of *M & J Coal* and *Rith IV,* OSM was engaging in a proper, and non-compensable, exercise of its police power in preventing a nuisance.

Defendant substantiates that water pollution has been an actionable nuisance in Tennessee for more than 150 years. *See, e.g., Neal v. Henry,* 1838 WL 1072, at *3, 1838 Tenn. LEXIS 5, at *8–9 (Tenn. Apr. 1838) (finding nuisance when defendant dammed creek and caused water to stagnate); *Love v. Nashville Agric. & Normal Inst.,* 146 Tenn. 550, 243 S.W. 304, 308 (1922) ("[I]t is well-settled law that if a person renders the water of another impure ... he thereby creates a nuisance, under our statute as well as the common law, which can be abated as such."); *Wayne County v. Tenn. Solid Waste Disposal Control Bd.,* 756 S.W.2d 274, 284 (Tenn.Ct. App.1988) ("The pollution of a person's water supply has been recognized as conduct amounting to a private nuisance.").

Moreover, the TWQCA merely codifies this principle. Section 69–3–102(a) of the TWQCA recognizes that the waters of the state are held in trust for its citizens, subject to the citizens' right to unpolluted waters. *See* Tenn.Code Ann. § 69–3–102 (2002); *see also Rith I* at 114. The TWQCA's purpose is to abate past pollution and prevent future harm to the state's waters, and it creates an extensive permitting process which disallows the issuance of a permit which would allow pollution. *See* Tenn.Code Ann. §§ 69–3–105(b), 108(e) (2002). Included in the statutory definition of pollution are actions that

will "[r]esult or will likely result in harm, potential harm or detriment of the public health, safety or welfare." Tenn.Code Ann. § 69–3–103(22)(A) (2002).

It is clear that water pollution is an abatable nuisance under both Tennessee common law and the TWQCA. By granting the section 1272 petition, OSM exercised its police power to protect its citizens from a nuisance, thereby weighing this factor of the *Penn Central* analysis in the Government's favor.

### iii. *Economic impact*

The " 'economic impact of the regulation upon the claimant' is 'measured by the change, if any, in the fair market value caused by the regulatory imposition.' " *Forest Properties,* 177 F.3d at 1367 (quoting *Florida Rock,* 18 F.3d at 1567). Given the court's finding that plaintiff lacked reasonable investment-backed expectations and that the section 1272 petition restricted a common law nuisance, even a showing of severe diminution in economic value will not result in a compensable partial regulatory taking. *See Rith IV* at 1352 (finding that "substantial diminution" in value of plaintiff's coal leases did not evince compensable taking, because plaintiff lacked reasonable investment-backed expectations and government was regulating through its police power); *see also Penn Coal,* 260 U.S. at 413, 43 S.Ct. 158 ("Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law."). As the Federal Circuit recently stated, the Government is entitled to summary judgment on a partial regulatory takings claim where plaintiffs lacked reasonable, investment-backed expectations, even when the challenged government action " 'substantially reduced the value of plaintiffs' property.' " *Good,* 189 F.3d at 1363 (quoting *Avenal,* 100 F.3d at 937).

Both parties have presented valuation data, yet neither valuated the appropriate

---

**23.** Although plaintiff repeatedly charges that the OSM findings are somehow inadequate, this court is not the proper forum for plaintiff to make such an argument. As explained *infra* section II, plaintiff's choice to withdraw its district court challenge to the section 1272 petition prevents it from attacking the validity of the

Director's findings. While plaintiff is free to claim that Tennessee law does not recognize water pollution as a common law nuisance, it may not rebut defendant's nuisance argument on the alleged insufficiency of the evidence supporting the OSM Director's decision.

parcel as a whole. *See generally* Weir Study; Micon International Limited, "The Fair Market Value at September 13, 1996, of the Coal Interests of Appolo Fuels, Inc., in and around the Fern Lake Petition Area, Claiborne County, Tennessee," Nov. 19, 2001. However, as noted, the *Rith IV* court concluded that a 91% reduction in mineable coal, when viewed against plaintiff's ability to profit from its coal holdings, did not constitute a compensable taking. *See Rith IV* at 1352. Plaintiff has made no showing that it cannot mine on the portions of Leases 5A, 14A, 15A, 16A and 17A that lie outside the petition area. Although plaintiff contends that the section 1272 petition rendered unmineable 78% of the tonnage on Lease 5A, and 92% of the tonnage on Lease 14A, it has not shown that the petition "makes it impossible for [plaintiff] to profitably engage in [its] business." *Keystone*, 480 U.S. at 485, 107 S.Ct. 1232. Even if plaintiff's partial regulatory takings claim was not diminished by the court's findings on plaintiff's investment-backed expectations and the character of the regulatory action, plaintiff has put forth an insufficient showing to generate a genuine issue of fact as to the economic impact prong of the *Penn Central* analysis.

Plaintiff lacked a reasonable investment-backed expectation that it could mine unobstructed by the complex regulatory framework that characterizes the mining industry. The OSM decision prevented plaintiff from engaging in an enjoinable nuisance, *i.e.*, polluting the city of Middlesboro's water supply. While the grant of the petition reduced the coal reserves available to plaintiff, plaintiff has not shown that it cannot exploit the portions of its leases that lie outside the petition area.

Accordingly, the court grants defendant's summary judgment motion as to plaintiff's partial regulatory takings claim.

### 4) *Temporary taking*

■ Plaintiff charges that OSM's delay in granting the section 1272 petition should constitute a temporary taking. It contends that OSM exceeded the 12–month statutory timetable for rendering a decision on a section 1272 petition. *See* 30 U.S.C. § 1272(c) (requiring hearing within ten months of section 1272 petition and decision within 60 days of hearing). Plaintiff's temporary taking allegedly spans from February 15, 1995 (one year and one day after filing of section 1272 petition), to September 13, 1996 (the date on which the petition was granted).

In *Tahoe–Sierra* the Supreme Court addressed a landowner's contention that two moratoria constituted a compensable taking and reiterated that the *Penn Central* analysis applies to temporary regulatory activity. *See* 535 U.S. 302, 122 S.Ct. 1465, 1484–85, 152 L.Ed.2d 517. In the case at bar, defendant posits that the Federal Circuit, in addition to the *Penn Central* criteria, requires plaintiff to show "extraordinary delay on the part of the permitting agency" to establish that a temporary taking occurred. Def.'s Br. filed May 20, 2002, at 52. The Federal Circuit's recent decision in *Boise Cascade Corp. v. United States* validates defendant's position that "absent denial of the permit, only an extraordinary delay in the permitting process can give rise to a compensable taking." 296 F.3d 1339, 1350 (Fed.Cir.2002).

The Federal Circuit clarified the meaning of "extraordinary delay" in *Wyatt v. United States*, a case involving a permit denial by the Tennessee office of OSM. *See* 271 F.3d 1090 (Fed.Cir.2001). Plaintiff in *Wyatt* applied for a mining permit from OSM in October 1984; two months later, OSM informed plaintiff that its application was missing at least 28 items of required information. Plaintiff corrected these deficiencies by March 1985. OSM then deemed the permit application administratively complete and began its technical review process. In May 1985 OSM again requested additional information, and plaintiff responded one month later. Because plaintiff's response was inadequate, OSM requested at least 29 specific pieces of additional information in December 1985. Instead of responding to the request, plaintiff sought assistance from OSM's Small Operator Assistance Program ("SOAP"). OSM denied the permit application in July 1986 before it acted on the SOAP application. Plaintiff appealed to an administrative law judge, who requested that the parties attempt to facilitate the permit process by

supplying OSM with the requested information. Plaintiff and OSM continued to squabble until April 1994, when OSM finally denied plaintiff's permit request. After the denial plaintiff sued for a temporary taking.

Noting that the mere existence of a permitting program and the initiation of permit proceedings do not constitute a taking,[24] the Federal Circuit allowed that a temporary taking could occur if an extraordinary delay is present in the government decision-making process. *See Tabb Lakes*, 10 F.3d at 803. However, the *Wyatt* court emphasized that only extreme circumstances warrant a finding of extraordinary delay. The court pointed out that the Supreme Court had concluded in *Tahoe–Sierra* that a 32–month series of moratoria did not qualify as a compensable taking. The court also cautioned that "[b]ecause delay is inherent in complex regulatory permitting schemes, [a court] must examine the nature of the permitting process as well as the reasons for any delay." 271 F.3d at 1098. While the length of delay should also be considered, it is not the primary factor in a temporary takings analysis; also, "it is the rare circumstance that [a court] will find a taking based on extraordinary delay without a showing of bad faith." *Id.* (citing *Tabb Lakes*, 10 F.3d at 803). Moreover, the court indicated that, in terms of deciding what "additional information is required to satisfy statutorily imposed obligations," deference should be granted to agencies that implement complex regulatory schemes. *Id.* It was deemed essential to "recognize that delay in the permitting process may be attrib-

utable to the applicant as well as the government." *Id.*

Despite the nearly ten-year delay in processing plaintiff's application, the Federal Circuit concluded that no extraordinary delay had occurred in *Wyatt*. Based on OSM's expertise in the area, the court acknowledged the significant deference owed to OSM in its processing of plaintiff's permit application and attributed some of the delay to plaintiff's inadequate responses to OSM's request for information.

Applying the above analytical framework to this case, the court finds that OSM's processing of the section 1272 petition did not effect a temporary taking. Although OSM exceeded the time line for decision making codified in section 1272(c), defendant justifies the additional time taken by OSM based on the agency's determination that its decision on the section 1272 petition must comply with both section 522(d) of SMCRA (statement of impact on environment, economy, and coal supply), *see* 30 U.S.C. § 1272(d), and section 102(2)(C) of NEPA (statement of impact on environment), *see* 42 U.S.C. § 4332(2)(C).[25]

In light of the Federal Circuit's admonition that judicial deference is required when reviewing an agency determination with respect to the satisfaction of statutory obligations, this court cannot find that OSM's decision to follow the dictates of both statutes, and the resultant delay in processing the section 1272 petition, constituted an ex-

---

**24.** The Supreme Court has held that the requirement that "a person obtain a permit before engaging in a certain use of his or her property does not itself 'take' the property in any sense: after all, the very existence of a permit system implies that permission may be granted." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 126–27, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985).

**25.** 30 U.S.C. § 1272(d) reads: "Statement. Prior to designating any land areas as unsuitable for surface coal mining operations, the regulatory authority shall prepare a detailed statement on (i) the potential coal resources of the area; (ii) the demand for coal resources; and (iii) the impact of such designation on the environment, the economy, and the supply of coal." 42 U.S.C.

§ 4332(2)(C) requires that all federal government agencies

include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on: (i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

traordinary delay.[26] The total delay in this case was just over one year. To characterize such a delay as extraordinary would not be consistent with the import of Supreme Court and Federal Circuit precedent, and plaintiff presented no case law at all in arguing the issue. When the Federal Circuit in *Wyatt* determined that an almost ten-year delay in processing plaintiff's application was not an extraordinary delay, the regulatory agency in that case was the Tennessee branch of OSM. Given the similarity of that case to this one, the legal result shall be the same.

Defendant's motion for summary judgment as to plaintiff's temporary takings claim is granted.

## II. *Defendant's Motion in Limine*

After defendant filed, on June 18, 2002, its Motion *in Limine* To Bar Plaintiff from Challenging the Validity of the Government Action that Allegedly Effected a Taking in this Case, the court ordered that briefing proceed in tandem with defendant's motion for summary judgment because the same issues were involved. *See* Order entered on July 10, 2002. Although the court has granted defendant's summary judgment motion in its entirety, certain of its rulings are predicated on arguments made in defendant's motion *in limine*. Thus, the court addresses the motion.

Defendant argues that plaintiff, having voluntarily dismissed its district court challenge to the section 1272 petition, *"must* assume that [the grant of the petition] was valid in all respects in order to proceed with its takings case in this Court." Def.'s Br. filed June 18, 2002, at 14. To this end, defendant asserts that "any evidence attacking the designation [of the petition area as unsuitable for surface mining], . . . and the agency documents supporting [it], should be excluded as unnecessary, irrelevant, and inadmissible." Def.'s Br. filed June 18, 2002, at 14. Defendant proposes that "any evidence purporting to demonstrate that Plaintiff could have received permits absent the [section 1272 petition] is irrelevant and should likewise be excluded." *Id.* at 14–15.

Plaintiff responds that defendant is putting forward its argument in order to absolve itself from having to prove a nuisance defense to plaintiff's takings claim. *See* Pl.'s Br. filed Sept. 5, 2002, at 37. If it is prohibited from presenting evidence that implicates the section 1272 petition, plaintiff argues that the petition will be "conclusive on the nuisance issue." *Id.* at 38. Conceding that OSM's "decision is valid, in the sense that the Director was legally authorized to make the decision," plaintiff nonetheless reads Federal Circuit precedent as not forcing plaintiff to "concede that all of the Director's conclusions were accurate." *Id.* at 38. As plaintiff notes, " 'validity' is not the same thing as factual or legal correctness." *Id.* at 39.

Both defendant's and plaintiff's arguments hinge on the "validity" of the underlying agency action and the judicial deference owed to the result of that action. As plaintiff observes, "validity" in the takings context does not refer to the outcome of the governmental action that allegedly effected a taking; rather, it denotes whether the government official had authority to perform the action at issue. The Federal Circuit recently addressed the meaning of "valid" governmental action by acknowledging that its previous takings jurisprudence occasionally had referred to "invalid" or "illegal" government conduct as "unauthorized;" however, the court clarified that it "understand[s] those references [to unauthorized conduct] to require a showing that the conduct was *ultra vires, i.e.,* it was either explicitly prohibited or was outside the normal scope of the government officials' duties." *Del–Rio Drilling Programs, Inc. v. United States,* 146 F.3d 1358, 1363 (Fed.Cir.1998); *accord Custer County Action Assoc. v. Garvey,* 256 F.3d 1024, 1042 (10th Cir.2001).

■ The question of authorization has important jurisdictional implications for a takings claimant, because a "compensable taking arises only if the government action in question is authorized." *Del–Rio,* 146 F.3d at 1362. An unauthorized government action cannot predicate liability for a compensable taking, given that it does not "vest some kind of title in the government[,] and entitlement

---

26. The court lacks jurisdiction to review the mer-    its of the agency decision. *See infra* section II.

to just compensation in the owner or former owner." *Armijo v. United States,* 229 Ct.Cl. 34, 40, 663 F.2d 90, 95 (1981), *cited with approval in Del–Rio,* 146 F.3d at 1362. Therefore, a "claimant must concede the validity [or authorization] of the government action which is the basis of the taking claim to bring suit under the Tucker Act ...." *Tabb Lakes,* 10 F.3d at 802.

Advancing the issue of authorization one step further, defendant argues that, in a takings action brought in the Court of Federal Claims, the alleged taker is entitled to proceed on the presumption that the underlying agency determination is both authorized and accurate. *See* Def.'s Br. filed June 18, 2002, at 13 (claiming that "the law of the Federal Circuit" gives Government right to have takings claim "assessed on the basis that its regulatory action was valid and correct in all respects"). Defendant grounds this argument on *Florida Rock* and asserts that this presumption of accuracy remains the law in this circuit.

■ Authorization to act does not equate to accuracy of outcome, as "a government official may act within his authority even if his conduct is later determined to have been contrary to law." *Del–Rio,* 146 F.3d at 1362; *see also Custer County,* 256 F.3d at 1042 ("An agency may act within its authority even if its action is later determined to be legally erroneous."); *Paalan v. United States,* 51 Fed.Cl. 738, 748 (2002) ("The dispositive issue in a takings claim ... is not whether the Government's conduct was legal—rather, whether it was authorized."). Therefore, defendant is not entitled to a presumption that the Government's conduct was accurate (and, consequently, unassailable) merely because it was authorized. Defendant nevertheless is correct that, after a takings claimant has foregone, or not prevailed in, a district court challenge to the lawfulness of the agency action, the claimant must litigate its takings claim on the presumption that the governmental conduct was both authorized and accurate.

*Florida Rock* is instructive on this point. Plaintiff possessed the correct local zoning classification to allow it to mine limestone in an area of Dade County, Florida. However, 1972 amendments to the CWA drew the property under CWA jurisdiction, and the Corps prevented plaintiff from mining until it received a proper permit. Although plaintiff applied for a permit, it was denied after the Corps determined that granting the permit would not be in the public interest.

Plaintiff then brought suit for a partial regulatory taking in the Claims Court, and the trial judge issued a bench ruling which assumed that the Corps engineers were authorized to act and that the permit denial advanced a legitimate public purpose. A written opinion issued one year later by the trial court, however, challenged the lawfulness of the permit denial, finding that the engineers' fears that the mining would pollute the water supply were unfounded.

The Federal Circuit, in vacating and remanding the trial court's takings decision, noted that the "proper way to challenge the decision to grant or withhold the permit would be under the Administrative Procedure Act (APA)" in district court. 791 F.2d at 898. Similarly, the court determined that foregoing an APA challenge had the same effect as if the district court had upheld the agency determination in all respects. In sum, the court concluded that "the alleged taker had a right, in the Claims Court, to have the claim assessed on the basis that its regulatory action was valid and correct in all respects." *Id.* at 905.

*Rith III* is the Federal Circuit's most recent pronouncement on the appropriate deference to be accorded the underlying agency determination. After its permit was repealed by OSM, plaintiff filed an administrative appeal to the rescission. Both the Interior Department's Office of Hearings and Appeals, and the Interior Board of Land Appeals (the "IBLA") upheld the OSM decision. Plaintiff subsequently filed suit in district court for, *inter alia,* a review of the IBLA decision and a takings claim. After plaintiff voluntarily moved to dismiss its claim seeking review of the IBLA decision, the district court granted that motion with prejudice. The district court proceedings progressed to the point at which only plaintiff's takings claim remained, so the district

court transferred the case to the Court of Federal Claims.

When the trial court granted summary judgment to the Government on plaintiff's takings claim, plaintiff argued on appeal that *Del–Rio* entitled it to relitigate, in its takings claim, its previous unsuccessful challenges to the permit denial. The Federal Circuit, however, clarified that *Del–Rio* stands for the proposition that a takings claimant may bring a takings case in the Court of Federal Claims and/or a challenge to the lawfulness of the agency action in a district court, as they constitute "two separate wrongs [that] give rise to two separate causes of action." *Rith III* at 1365 (internal quotation marks omitted). A district court challenge to the agency action is not a predicate for a takings claim in the Court of Federal Claims, as a claimant may sue in that court "even if the government's action was subject to legal challenge on some other ground." *Id.* The court explained:

> To the extent that [plaintiff] suggests that *Del–Rio* entitles it to argue in the Court of Federal Claims that OSM's permit denial was unlawful under SMCRA, or to relitigate in the takings action its unsuccessful statutory challenge to the permit denial, it reads too much into *Del–Rio.* The question whether OSM violated SMCRA by its ruling on a permit application in a particular case was assigned by Congress to the administrative process within the Department of the Interior, subject to judicial review in a district court. *Del–Rio* does not give the Court of Federal Claims authority to adjudicate that issue *de novo.*
>
> . . . .
>
> [H]aving foregone its challenge to OSM's administrative actions, [plaintiff] is not free to renew its challenge to those actions under the cover of a takings claim . . . . [Plaintiff] is thus required to litigate its takings claim on the assumption that the administrative action was both authorized and lawful. On the facts of this case, the consequence of assuming the lawfulness of OSM's actions, *i.e.,* that OSM was correct in concluding that [plaintiff's] mining activities constituted an unacceptable threat of

. . . pollution of groundwater in the area surrounding the mine operations, is to limit the issue before us to . . . [the alleged] taking.

*Id.* at 1365–66.

■ The import of *Florida Rock* and *Rith III* is unavoidable. Plaintiff is precluded from attacking the lands unsuitable designation in the Court of Federal Claims. *See M & J Coal,* 47 F.3d at 1154 ("Neither the Court of Federal Claims nor [the Federal Circuit] may entertain a collateral challenge to the validity of OSM's actions."). Because plaintiff voluntarily dismissed its district court challenge to OSM's actions, defendant is entitled to a presumption that OSM's decision was both authorized and legally correct. Plaintiff cannot argue successfully that *Del–Rio* allows it to challenge the factual basis of OSM's decision, as *Rith III* held that such a challenge may be brought only in district court. *Rith III* at 1365–66.

With respect to authorization, plaintiff has acknowledged that OSM was authorized to consider the petition and to render its decision. *See* Pl.'s Br. filed Sept. 5, 2002, at 38. With respect to the accuracy issue, plaintiff presents contradictory assertions. On the one hand, it claims that it "does not ask this Court to re-examine the Director's . . . decision, or whether he correctly evaluated the petition issues." *Id.* at 40. On the other hand, plaintiff contends that its "proof will show that it could have met SMCRA standards and would have received a permit, absent the designation . . . [and that] mining could be accomplished without material harm to the water in Fern Lake." *Id.* Plaintiff apparently is contending that it is precluded only from attacking the grant of the section 1272 petition, so that it can present evidence showing that, absent the petition, OSM would have granted plaintiff a mining permit. To allow plaintiff to present such evidence would ignore the presumption accorded alleged takers in this circuit that the agency determination was both authorized and correct in all respects. Plaintiff may not pick and choose which aspects of OSM's decision it may attack in prosecuting a takings claim.[27]

---

27. *See supra* note 5.

## CONCLUSION

Plaintiff has not presented sufficient evidence to preclude summary judgment on its categorical regulatory takings claim, its partial regulatory takings claim, and its temporary takings claim. Defendant established that plaintiff cannot show that the section 1272 petition destroyed all economically viable use of the parcel as a whole. Defendant established that plaintiff cannot satisfy the *Penn Central* factors that govern the analysis of a partial regulatory takings claim. Defendant established that plaintiff could not demonstrate that OSM's delay in granting the petition amounted to extraordinary delay. Because plaintiff may not challenge the OSM Director's decision to grant the section 1272 petition in this court, only the three takings claims ruled on are within the court's jurisdiction. The court thus grants defendant's motion for summary judgment in full. Accordingly,

**IT IS ORDERED**, as follows:

1. Defendant's Motion for Summary Judgment is granted, and the Clerk of the Court shall enter judgment for defendant.

2. Defendant's Motion *in Limine* is granted, insofar as plaintiff may not attack the accuracy of the section 1272 petition in the Court of Federal Claims.